UNITED STATES of America, Appellee,

v.

George DALY and Louis Giardina, Defendants–Appellants.

Nos. 295, 294, Dockets 87–1257, 87–1258.

United States Court of Appeals,
Second Circuit.

Argued Oct. 13, 1987.

Decided March 28, 1988.

Douglas Grover, Sp. Atty., U.S. Dept. of Justice, Organized Crime Strike Force, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for the E.D. New York, Brooklyn, N.Y., Laura Ward, Sp. Atty., U.S. Dept. of Justice, Brooklyn, N.Y., Louis M. Fischer, Deborah Watson, U.S. Dept. of Justice, Washington, D.C., on the brief), for appellee.

James Kousouros, New York City (William F. Suglia, New York City, on the brief), for defendant-appellant Daly.

James M. LaRossa, New York City (John W. Mitchell, LaRossa, Mitchell & Ross, New York City, on the brief), for defendant-appellant Giardina.

Before KEARSE, PIERCE, and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Defendants George Daly and Louis M. Giardina appeal from judgments entered in the United States District Court for the Eastern District of New York, following a jury trial before Jack B. Weinstein, *Chief Judge*, convicting Daly on two counts of accepting bribes in violation of the Taft–Hartley Act, 29 U.S.C. §§ 186(a)(2) and (b)(1) (1982); and convicting Giardina on one count of aiding and abetting Daly in receipt of a bribe, in violation of 29 U.S.C. §§ 186(a)(2) and (b)(1) and 18 U.S.C. § 2 (1982); one count of obstructing a criminal investigation, in violation of 18 U.S.C. § 1510 (1982); and one count of conspiring

to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (1982). Daly was sentenced to two consecutive one-year prison terms, fined $10,000 on each count, and required to pay a special assessment of $50 on each count. Giardina was sentenced to concurrent prison terms of five years each on the conspiracy and obstruction counts and one year on the Taft–Hartley count, to fines totaling $40,000, and to special assessments of $50 on each count. On appeal, Daly contends that the trial court erred in admitting in evidence certain surveillance tapes, and he challenges his sentence as excessive. Giardina contends that the court erred in admitting expert testimony as to the existence and operations of the Gambino organized crime family, and he challenges the sufficiency of the evidence to convict him on any count. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

Daly and Giardina were named in a 22-count superseding indictment charging them and 14 other defendants with various crimes arising out of activities of the Gambino crime family. Daly was charged in five counts: one count of conspiring to conduct a pattern of racketeering activity through the Gambino family in violation of 18 U.S.C. § 1962(d), three counts of accepting bribes in violation of the Taft–Hartley Act, 29 U.S.C. §§ 186(a)(2) and (b)(1), and one count of conspiring to pay a bribe to one Thomas Patchell in violation of 29 U.S.C. § 186(a)(2). Giardina was charged in four counts: one count of RICO conspiracy in violation of § 1962(d), one count of aiding and abetting Daly's receipt of a bribe in violation of 29 U.S.C. §§ 186(a)(2) and (b)(1) and 18 U.S.C. § 2, one count of conspiring to pay a bribe to Patchell in violation of 29 U.S.C. § 186(a)(2), and one count of obstructing a federal criminal investigation in violation of 18 U.S.C. § 1510. Daly, Giardina, and codefendant Julie Miron were severed from the other defendants for trial.

The government's case against these three defendants was presented principally through the testimony of Robert Matthews, an officer of Matthews Industrial Piping Co. ("Matthews Piping"), a piping contractor located in the Bronx, New York; and tape recordings the government had obtained through surveillance of the home of Paul Castellano, then the boss of the Gambino crime family. Summarized briefly and taken in the light most favorable to the government, the evidence at trial showed the following events.

### A. *The Payments By Matthews*

Daly was the business agent-at-large for Local 638 of the Enterprise Association of Steam Fitters ("Local 638"), which had jurisdiction over steam-fitting jobs in the five boroughs of New York City and on Long Island. Giardina, who also was active in New York labor union affairs, was an acquaintance of both Daly and Castellano. Miron was a lumber contractor who was acquainted with Castellano, Daly, and other union officials.

In 1981, Matthews Piping submitted a $10 million bid for a contract to replace the piping in a deepwater oil storage and pipeline facility at Port Mobil in Staten Island, New York ("Port Mobil"). Because Local 638 could supply only a small number of welders with the skills necessary to perform the Port Mobil job, Matthews planned to use welders from other states, and his bid was premised on the lower cost of the imported labor.

Matthews testified that in the fall of 1981, anticipating that he would need the cooperation of Local 638 in his attempt to import welders for the Port Mobil job, Matthews met with Daly, explained why he needed to use imported labor, and gave Daly $5,000 in cash. Daly told Matthews he would see what he could do. In November, Matthews Piping was awarded the Port Mobil contract. Despite the payment to Daly, when the imported welders began working, Local 638 picketed the jobsite. The picketing was led by Thomas Patchell, a business agent for Local 638. Matthews testified that he still believed, however, that Daly could quiet the union. Accordingly, in December 1981, while the picket-

ing was in progress, he met with Daly and gave him another $5,000 in cash.

Matthews Piping filed charges with the National Labor Relations Board, seeking to have the pickets removed. The parties reached a settlement in which the union agreed to remove the pickets for 30 days. During the 30-day period, Patchell discovered that the imported welders belonged to other locals around the country. He filed charges against these welders for accepting employment with a nonunion contractor, causing the "ring leader" among the out-of-state welders to be fined by his local and threatened with expulsion. As a result, Matthews lost most of his welders on the jobsite. He complained to Daly, but Daly replied that he was unable to control Patchell.

In January 1982, seeking advice on how to solve his problem with Local 638, Matthews consulted Miron, whom he had known for some twenty years, because "Miron had pretty good union connections, he knew a lot of the big people." Miron assured Matthews that he would arrange to eliminate the union's objection to the imported welders, but that Miron "would have to pass out a hundred thousand dollars to people." Some weeks later, Matthews delivered $50,000 in cash to Miron at Miron's home, agreeing to bring the remaining $50,000 at a later time. Miron assured Matthews that he would take care of the problem. Miron gave $25,000 of this payment to Daly. He also gave $15,000 to Castellano, who, in turn, gave at least $4–5,000 to Giardina.

Some months after the first visit, Matthews returned to Miron's home with the remaining $50,000. When Miron stated that he had given $25,000 of the first payment to Daly, Matthews replied that he thought Miron foolish to give money to Daly, because he did not believe Daly could be of help. Matthews told Miron that Matthews had previously given Daly $10,000. Miron responded that Matthews should never have paid money to Daly directly.

Despite his efforts to neutralize Patchell, Matthews was forced on May 6, 1982, to sign a collective bargaining agreement with Local 638. As a result, his costs on the Port Mobil job were higher than he had originally anticipated. On several occasions thereafter, Matthews contacted Miron, unsuccessfully demanding the return of his money.

In early May 1983, Matthews sent Miron a registered letter, threatening to go to the authorities if at least some of his money were not returned. In the first week of May, Matthews met with Daly and similarly threatened to go to the FBI or other authorities. As revealed by the surveillance tapes discussed below, Matthews's threat was promptly relayed by Daly to Giardina and by Giardina to Castellano.

## B. *The Payment to Matthews*

At least as early as March 1983, the FBI was conducting an investigation into the activities of the Gambino crime family. In an ongoing electronic surveillance, government agents intercepted and recorded many conversations at the home of Castellano. Tape recordings of several of these conversations were played for the jury in order to provide background information on the nature and structure of organized crime in general and the Gambino family in particular. As discussed in greater detail in Part II.B. below, FBI agent James Kossler testified as an expert on the matters heard on the tapes, and he outlined the process by which the Gambino family had gained control over certain labor unions in the New York City area.

Daly's voice was not identified on any of the tapes. Giardina was a participant in at least three conversations. These included one on May 5, 1983, and one on June 2, 1983, in which Giardina and Castellano discussed the payments that Matthews had made to Daly and Miron.

In the May 5, 1983 conversation, Giardina told Castellano that Daly had called Giardina the day before with some urgency, to tell him that Matthews was threatening to "go[ ] to the Task Force." Castellano responded, "You know why," stating it was because Daly had "robbed his money." Castellano viewed Daly's actions as a detriment to the entire organization. He was

annoyed both because Daly had failed to give any money to Patchell to secure Patchell's assistance, and thereby had failed to give Matthews the labor peace he had bargained for, and because Daly had accepted $5,000 from Matthews on his own initiative, without the approval of Castellano. Giardina defended Daly, stating that he had received Daly's assurance that some of the money had been distributed to labor union officials other than Patchell and that those payments had permitted Matthews to get at least some work done on the Port Mobil project.

The conversation repeatedly returned to Matthews's threat to go to the authorities, with Giardina noting that "he's crying cop," and that Daly was "worried that Matthews is gonna rat him out." Castellano noted that Matthews had a close connection with "somebody named Lent in Congress." Giardina thought Lent was a member of a Task Force or that Matthews had some other close relative who was a member of a Task Force. Finally, having noted that "[t]he deal was a hundred," that Daly was supposed to receive $50,000 and share it with Patchell, and that the family was supposed to receive the other $50,000, Castellano determined that Matthews would have to be paid at least $25,000, which "may not be enough."

On June 2, 1983, Giardina returned to Castellano's home. He reported that he had received assurances from Daly that money had been returned to Matthews. On June 6, Miron reported to Castellano that he had retrieved $25,000 from Daly and would return it to Matthews.

In all, in the spring or summer of 1983, in accordance with Castellano's orders, Miron returned $50,000 to Matthews in two $25,000 installments.

## C. *The Defense Case*

Daly testified in his own behalf. He confirmed many of the events testified to by Matthews, including Matthews's 1981 request to use imported labor on the Port Mobil job and to have Daly "lay off him." He described a conversation with Matthews during the first week of May 1983, in which Matthews stated that he had given a large amount of money to Miron and that he was going to go to the FBI or other law enforcement authorities; Daly acknowledged that he had promptly—perhaps on the same day—reported Matthews's threat to Giardina. Daly testified, however, that Matthews had never offered him any money, either on the Port Mobil project or at any other time when Daly was an agent for Local 638.

Giardina did not testify and presented no evidence in his defense.

## D. *The Verdicts*

At the close of the evidence, Chief Judge Weinstein dismissed the conspiracy-to-bribe count as to all three defendants for lack of evidence that they had conspired to bribe Patchell. He also dismissed the RICO conspiracy count against Daly, finding that, of the three bribes alleged to have been taken by Daly, the evidence indicated that only one, the $100,000, was taken pursuant to a conspiracy, and the two alleged $5,000 payments had been merely "private taking[s]." Thus, the two $5,000 bribes could not be attributed to the alleged RICO enterprise, and the court concluded that Daly could not be convicted of the two predicate acts essential to the establishment of a RICO conspiracy involving him.

The jury found Daly guilty on two of the three Taft–Hartley counts, finding that he had taken a $5,000 bribe from Matthews in November 1981 and had conspired with Miron and Giardina to take the final $100,000 bribe. It acquitted him of the charge that he had accepted a second $5,000 payment in December 1981. Giardina was found guilty on all of the undismissed counts against him, *i.e.*, the Taft–Hartley offense of aiding and abetting Daly in the receipt of the $100,000 bribe, obstruction of the federal criminal investigation by seeking to bribe Matthews with the repayment of part of the $100,000, and a RICO conspiracy encompassing both the Taft–Hartley and the obstruction offenses.

Daly and Giardina were sentenced as indicated above.

## II. DISCUSSION

On his appeal, Daly argues principally that the trial court erred in admitting the FBI surveillance tapes into evidence against him. He also contends that his sentence was unduly harsh. Giardina contends principally that much of the testimony of agent Kossler should have been excluded and that the evidence was insufficient to support his conviction on any count. For the reasons below, we reject all of defendants' arguments.

### A. *The Admissibility of the Tapes Against Daly*

The FBI surveillance tapes were admitted against Daly on the ground, *inter alia,* that they reflected statements of his coconspirators in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E). Daly contends that admission of the tapes on this ground was improper because there was insufficient evidence to connect him with the alleged conspiracy. He also contends that the tapes that did not mention him, which were admitted as background and served as proof of a RICO enterprise, should have been excluded as to him once the court dismissed the RICO conspiracy count against him. We reject both contentions.

In order to admit out-of-court statements pursuant to Rule 801(d)(2)(E), the trial court must find that the government has established by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made in furtherance of the conspiracy. *See, e.g., United States v. DeJesus,* 806 F.2d 31, 34–35 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987). In making these preliminary factual determinations, the court may take into account the proffered out-of-court statements themselves if those statements are sufficiently reliable in light of independent corroborating evidence. *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987). The evidence in the present case plainly warranted admission of the tapes against Daly.

■ The pertinent discussions on the May 5, 1983 tape were, according to Giardina's introduction, precipitated by Daly's May 4, 1983 telephone call to and meeting with Giardina to tell him that Matthews was threatening to go to the authorities if some of his money were not returned to him. There was discussion, *inter alia,* of Daly's having received at least $5,000 in cash directly from Matthews and an additional $25,000 of Matthews's money from Miron. Giardina and Castellano discussed the $15,000 of Matthews's money that they themselves had received and shared; and Castellano described Matthews's threat to go to the authorities as a problem "we" now have. These details were corroborated by the trial testimony of Matthews or of Daly himself. Thus, Matthews testified that he had paid Daly $5,000 in cash; that Miron had promised to help with the labor problems but would have to pass out $100,-000 to various "people"; that after receiving money from Matthews, Miron told Matthews he had paid $25,000 of that money to Daly; and that Miron's reaction to learning that Matthews had already given Daly $10,-000 was that Matthews should not have given the money to Daly directly. Daly testified that in early May 1983, after Matthews had threatened to go to the authorities if he did not get some of his money back, Daly immediately informed Giardina of the threat. Thus the evidence independent of the tape provided sufficient corroboration of the detailed recorded statements to warrant a finding that the taped conversation was reliable. Accordingly, the court could consider that tape in determining whether there was in fact a conspiracy among Daly and the participants in the taped conversations.

■ The May 5 conversation plainly showed that Daly's receipt of a portion of Matthews's $100,000 was part of a joint venture. Castellano stated, for example, that "[t]he deal was a hundred," of which Daly was to get $50,000 and "we" were to get the other $50,000; that Daly was supposed to have given some of his $50,000 to

Thomas Patchell and that the Gambino family had relied on Daly to do so ("[W]e thought this man was gonna produce. All of a sudden, we get a hold of Tom, Tom says he didn't get money."); and that the family would have to give some money to Matthews in light of Daly's failure to produce. These were statements that plainly were made in furtherance of a continuing conspiracy, of which at least Castellano, Miron, Giardina, and Daly were members, and the tape was thus properly admitted as substantive evidence against Daly.

■ Nor do we find merit in Daly's argument that once the RICO conspiracy count was dismissed as against him, the tapes of conversations that did not mention him should not have been considered against him and that their admission "constituted extreme unfair prejudice which resulted in his conviction on Counts 7 and 9." (Daly brief on appeal at 45.) Preliminarily, we note that this argument does not appear to have been properly preserved for appeal, since Daly's objection to the trial court's proposed charge that "all evidence in the case was admissible against all defendants," was simply that "there should be some type of limitation there." There was no apparent attempt to distinguish between tapes on which Daly was mentioned and those on which he was not mentioned.

■ Even were the objection properly preserved, however, we would reject it for two reasons. First, notwithstanding the dismissal of the RICO conspiracy count as against Daly, the tapes that did not mention Daly were properly admitted as background information, and the fact that there may have been only one act by Daly that could serve as a RICO predicate act did not mean that the jury should not have been given the setting against which the alleged $100,000 payment was made.

■ Finally, even if the jury should have been instructed to ignore the non-Daly tapes in considering the counts against Daly, the failure so to charge is not a reason to reverse. Daly was charged on three Taft–Hartley counts of receiving bribes. The evidence that Daly had received at least one $5,000 bribe and part of

the $100,000 bribe was overwhelming. The jury found him guilty on those two counts and acquitted him on the third. We think it plain, both from the strength of the evidence and from the fact of an acquittal on one count, that the admission of the background information against Daly did not prejudice him.

**B.** *The Admission of Kossler's Testimony*

Giardina does not challenge the admission of the surveillance tapes against him. Rather, he contends that the admission of Kossler's testimony, part of which related to the tapes, denied him a fair trial because it included hearsay evidence that was neither needed as expert testimony nor proper as background evidence. We disagree.

■ Rule 702 of the Federal Rules of Evidence gives the trial judge broad discretion to admit expert testimony when he believes it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 703 provides that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to* the expert at or *before the hearing.* If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.*

Fed.R.Evid. 703 (emphasis added). Thus, if experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert witness may properly testify to his opinions and inferences based upon such hearsay. *United States v. Wright,* 783 F.2d 1091, 1100–01 (D.C.Cir.1986); *Soden v. Freightliner Corp.,* 714 F.2d 498, 502 (5th Cir.1983). The decision of the trial court to admit expert testimony is to be sustained on appeal unless it is shown to be "manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 355,

98 L.Ed.2d 380 (1987); *United States v. Cruz*, 797 F.2d 90, 96 (2d Cir.1986).

In light of these principles, subjects held to be appropriate for expert testimony have included explanations of organized crime structure such as the relative positions of "capo," "captain," and "crew," *see United States v. Ardito*, 782 F.2d 358, 363 (2d Cir.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986); explanations of organized crime jargon, *see United States v. Riccobene*, 709 F.2d 214, 230–31 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), and explanations of coded language, *see United States v. Levasseur*, 816 F.2d 37, 45 (2d Cir.1987). Expert testimony that is otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact. Fed.R.Evid. 704.

■ Independent of the matter of expert testimony, the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed. *See United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir.1984). If the evidence admitted as background consists of, or repeats, out-of-court statements that are hearsay and are not admissible by virtue of an exception to the hearsay rule, the background evidence generally is not properly admitted for the truth of the matters there asserted. When, however, the background evidence is testimony of the witness based on his own knowledge, or is expert testimony as to opinions or inferences arrived at in reliance on the type of evidence normally relied on by experts in the field, it may properly be considered as evidence of the truth of the matters asserted.

■ Kossler's testimony was properly admitted as expert testimony that was relevant to provide the jury with an understanding of the nature and structure of organized crime families. There is no question that there was much that was outside the expectable realm of knowledge of the average juror. For example, Kossler identified the five organized crime families that operate in the New York area; he described their requirements for membership, their rules of conduct and code of silence, and the meaning of certain jargon, such as the distinction between "a friend of ours" (*i.e.,* a member of organized crime) and "a friend of mine" (*i.e.,* only a personal acquaintance and not an organized crime member before whom "family" matters could be discussed); and he described how, in general, organized crime has infiltrated labor unions.

■ With respect to the conversations heard on several of the surveillance tapes, Kossler identified the various labor unions and their officials who were mentioned. He identified crime family members mentioned, and as to some stated whether they held office in a labor union. Notwithstanding Giardina's contention that there was no need for expert testimony, the trial court's view that these were matters as to which such testimony could be of assistance to the jury was not unreasonable, and the admission of the testimony was not an abuse of discretion.

Further, Kossler's testimony was, by and large, general insofar as it described organized crime's infiltration of labor unions and did not touch upon upon Matthews's payments to Daly or Miron or the subsequent payment to Matthews. Kossler did not mention Local 638 except to identify its trade jurisdiction; he did not mention Daly, Miron, or Giardina at all, and he did not testify at all with respect to any of the tapes on which Giardina was heard and Daly was discussed.

The only element of an offense on which Kossler's testimony touched directly was the existence of a RICO enterprise, as he gave his understanding of the existence of organized crime and the Gambino family. Although the trial judge originally told the jury that it could not use the expert testimony to establish directly "anything at issue in the case," he eventually instructed

the jury that the testimony could be considered as "proof of th[e] overall continuing enterprise." There was no objection by defendants to the latter charge; nor, given Kossler's unchallenged qualifications to testify as an expert, would such an objection have been sustainable under Rules 702, 703, and 704.

■ Finally, we find no flaw in the manner in which the trial court performed the functions assigned to it in determining whether and to what extent to allow Kossler's testimony to be used. It found, in accordance with Fed.R.Evid. 403, that the prejudice likely to be caused by admission of the evidence would not outweigh its probative value. Upon introduction of the testimony, the court instructed the jury that it was not required to accept the expert's testimony and that the question of "[w]hether there is any organized crime, whether these defendants had anything to do with organized crime, is for you to decide ..."; the final instructions made clear that it was the jury's province to determine whether or not the individuals named in the indictment functioned as an "enterprise." We conclude that the trial court's treatment of the testimony of Kossler did not deny Giardina a fair trial.

## C. The Sufficiency of the Evidence Against Giardina

Giardina contends that the evidence at trial was insufficient to convict him of aiding and abetting Daly's receipt of money in violation of the Taft–Hartley Act, of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, and, perforce, of having committed those offenses pursuant to a RICO conspiracy. In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *United States v. Sumnicht*, 823 F.2d 13, 15 (2d Cir.1987); *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing such a challenge, we must credit every inference that could have been drawn in the government's favor, *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840,

104 S.Ct. 134, 78 L.Ed.2d 128 (1983), "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses," *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983), and must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Taylor*, 464 F.2d 240, 245 (2d Cir.1972). These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Giardina has not carried his burden.

### 1. Aiding and Abetting the Taft–Hartley Violation

■ The Taft–Hartley Act makes it unlawful for an employee of a labor organization to accept money from an employer whose employees are represented by that organization. *See* 29 U.S.C. §§ 186(a)(2) and (b)(1). The indictment charged that Daly, employed by Local 638 as business agent-at-large, had received part of the $100,000 from Matthews in violation of these sections, and that in so doing he had been aided and abetted by, *inter alios*, Giardina. Giardina contends that the evidence was insufficient to support his conviction of aiding and abetting because it did not show that he had consciously sought to assist in Daly's receipt of the money, or that he was even aware of the payment until after the bribe had been fully consummated. We disagree.

While Giardina is correct that "[a] person cannot be found guilty of aiding and abetting a crime that already has been committed," *United States v. Shulman*, 624 F.2d 384, 387 (2d Cir.1980), the evidence here, taken in the light most favorable to the government, easily permitted the jury to infer that Giardina had been associated with receipt of the $100,000 payment from the outset. The evidence showed, *inter alia*, that the Gambino crime family, led by Castellano, had been successful in infiltrating and gaining control over labor unions,

and that Giardina was an aide to Castellano in labor matters. It was inferrable that Giardina had a close working relationship with Daly. He had known Daly for years, and he discussed with Castellano Daly's involvements in other jobs; Giardina spoke of being able to "square" arrangements with Daly. When Matthews threatened to go to the authorities, it was to Giardina that Daly, in Giardina's words, "comes running down." When Castellano decided that Matthews should receive some money back, it was Giardina who pressed Daly to make the repayment. Giardina reported on June 2, "I've been on his back every day."

It was Giardina who had introduced Daly to Miron. Miron, before receiving any payment from Matthews, told Matthews that in order to secure labor peace, $100,000 would have to be paid to various "people." The natural inference was that those "people" would, in exchange for the $100,000, eliminate Matthews's union problems. That inference was confirmed by the conversation between Giardina and Castellano on May 5, which made clear that the "deal" had been that Matthews would pay $100,000, that the Gambino family would receive half of this, that Daly would receive the other half, and that the family was relying on Daly to "produce" by passing some of his $50,000 to Patchell. Though Daly apparently did not carry out his part of the deal, it was clear that upon receiving the first $50,000 payment from Matthews, Miron gave half to Daly and $15,000 to Castellano, and that Castellano gave about one-third of that amount to Giardina.

In all, the evidence was ample to permit the jury to infer beyond a reasonable doubt that Giardina had associated himself from the outset with the arrangements whereby Daly, Giardina, and others in the Gambino crime family would share the $100,000 from Matthews in exchange for eliminating Matthews's problems with Local 638.

## 2. Obstruction of an Investigation

Section 1510 of 18 U.S.C. prohibits "willful[ ] endeavors by means of bribery to obstruct, delay, or prevent the communication" "by any person to a [federal] criminal investigator" of information relating to a violation of any federal criminal statute. Giardina was convicted of violating this section by reason of the payment to Matthews of $50,000 in response to his threat to go to the authorities. Giardina contends that the evidence was insufficient to support his conviction under this section principally because there was no ongoing federal investigation to obstruct and because the return to Matthews of his own money could not, as a matter of law, constitute bribery. We are unpersuaded.

Preliminarily, we note that, in arguing that there was no existing federal investigation when the $50,000 was returned to Matthews, Giardina argues that Matthews received this money in July 1982. Though Matthews did so testify, the record makes plain that his recollection as to the timing was hazy. His responses to cross-examination efforts to pin down the timing were that he did not recall, but that "[i]f you want me to guess it was in the middle of '82." While Matthews's "guess" was 1982, his testimony was clear that the money was not paid to him until after he had written a registered letter to Miron threatening to go to the authorities. The record as a whole easily permitted the inference that this letter was written in 1983, not 1982. Thus, Congressman Norman Lent, whom Miron asked to intercede, placed the date of the letter in May 1983. Daly, who testified that Matthews had made the same threat to him orally, placed that conversation in the first week of May 1983. And the first taped conversation in which Giardina reported the threat to Castellano, and in which Castellano ordered the payment to Matthews, occurred on May 5, 1983. Thus, there was ample evidence from which the jury could find that the $50,000 payment was made to Matthews in response to his threats to go to the authorities in 1983.

Slightly more troublesome is Giardina's contention that § 1510 requires both an ongoing investigation and the defendants' knowledge of the investigation. Our decision in United States v. Siegel, 717 F.2d 9 (2d Cir.1983), on which Giardina relies, does not support this proposition. In that case,

we explicitly "emphasize[d] [t]hat we [we]re not deciding ... that § 1510 requires the existence of an actual criminal investigator or that an ongoing criminal investigation be in progress." *Id.* at 21. The government argues that the legislative history of § 1510 suggests that no investigation need be in progress because Congress intended that section to complement 18 U.S.C. §§ 1503 and 1505 (1982), which prohibit threats, bribery, extortion, etc., of witnesses and informants only after judicial proceedings have begun, *see United States v. Vesich,* 724 F.2d 451, 454 (5th Cir.1984) (attempt to obstruct a criminal investigation before a proceeding has been begun is not within § 1503). The congressional report relied on by the government does not appear to support the view that § 1510 reaches bribery of a potential informant at the pre-investigation stage. Though the report described § 1510 as "extending to informants and potential witnesses the protections now afforded witnesses and jurors [under §§ 1503 and 1505]," H.R.Rep. No. 658, 90th Cong., 1st Sess. 1, *reprinted in* 1967 U.S.Code Cong. & Admin.News 1760 ("House Report"), it ascribed the need for a section such as § 1510 to the fact that "there is no statute which presently protects witnesses *during the investigative stage,*" *id.* at 1762 (emphasis added). Further, the House Report included a discussion of "the required criminal scienter" which seemed to suggest that there must be a federal investigation of which the defendant is aware. *See id.* ("For example, if a person does not know that the investigator is a federal investigator, an act which would normally be in violation would not be so because of the lack of the scienter as to the identity of the investigator.").

Nonetheless, here, as in *Siegel,* it is unnecessary to decide whether § 1510 requires an ongoing criminal investigation, because the evidence was sufficient to support an inference that in fact there was an ongoing federal criminal investigation and that Castellano and Giardina sought to prevent Matthews from disclosing his information to federal investigators. Though the federal investigation into the Port Mobil job itself did not begin until after the payment was made to Matthews, there was an ongoing investigation into the infiltration of labor unions by the Gambino crime family. It was in the course of that investigation that the FBI obtained wiretap authorizations for the home of Castellano and secured the surveillance tapes that were admitted into evidence.

Giardina argues that, notwithstanding the FBI investigation, he and Castellano spoke only in terms of a threat by Matthews to go to a "Task Force," and that the only extant "Task Force" so denominated was a state, rather than federal, entity. Hence, he argues, there was no indication that he sought to impede communication to a "federal" investigator. We disagree. The jury was properly instructed that in order to find Giardina guilty under § 1510, it must find that the payment to Matthews sought to impede his communication of the Taft–Hartley violation to "a federal" criminal investigator. We think the jury was entitled to ascribe minimal significance to the fact that the principal federal investigation was conducted by a group denominated "Strike Force" rather than "Task Force," since it was plain from the surveillance tapes that Castellano and Giardina did not place a premium on precision in names and titles. More importantly, Giardina's argument fails to consider the other relevant evidence in the light most favorable to the government. That evidence included the fact that Daly testified that when Matthews spoke to him in May 1983, threatening to go to the authorities, Matthews may have mentioned the FBI, and that Daly reported to Giardina exactly what Matthews had said. Further, Giardina reported to Castellano that Matthews had threatened to Daly that he would go to the "Task Force"; Castellano identified Lent as a Congressman, plainly a federal official, and Giardina thought Lent was "supposed to be on a Task Force." Thus, there was sufficient evidence from which the jury could infer both that there was a federal investigation and that the defendants feared that Matthews would make his disclosures to federal investigators.

Finally, Giardina argues that his conviction under § 1510 must be set aside because bribery involves the conveyance of something of value, and § 1510 was not intended to reach the mere return to a potential informant of his own funds, especially where the informant had been a co-conspirator of the defendant. Again, we disagree.

First, in seeking to protect communication "by any person," the statute uses an unrestricted term that does not on its face exclude persons who have themselves participated in the crimes to be disclosed. Moreover, the legislative history suggests that § 1510 was designed in part to preserve potential lines of communication from members of organized crime as well as from innocent informants. The House Report noted that "[t]he real need for this legislation is in the difficulty encountered in the presentation of a case for trial in the field of organized crime and racketeering," and stated that the ability of organized crime to preserve its structure, power, and affluence lay in its "ability ... to impose silence *on its members*." House Report at 1761 (emphasis added). Criminal investigations are facilitated by assistance from within a crime organization, and the prior misdeeds of the informant do not remove him and his potential information from the scope of § 1510.

Nor are we persuaded that defendants' $50,000 payment to Matthews did not constitute something of value to him because it was merely the return of his own money. Matthews had, in bribing the defendants, parted with ownership of the $100,000; he plainly did not have an enforceable right either to recover those funds or to win damages for breach of his bargain. Thus, the $100,000 could no longer be considered funds belonging to Matthews.

At trial, defendants argued that the money repaid to Matthews was not a bribe to dissuade him from going to the FBI but was merely a return to him of part of his payment because the defendants regretted not having given him the labor peace he had sought to buy. Although in the May 5 conversation, Castellano repeatedly noted with disapproval that they had taken Matthews's money and had given him nothing in return, the question whether the impetus for the $50,000 payment to Matthews was simply remorse because he had not received the benefit of his bargain or was instead an intent to dissuade him from informing the FBI was one for the jury. The jury was properly instructed on this question, and there was ample evidence from which it could infer that the $50,000 payment to Matthews was intended to purchase his silence. An entire year elapsed between Matthews's signing of the collective bargaining agreement with Local 638 and the time that Castellano ordered the return of the $50,000. During that time, Matthews repeatedly complained to Miron that he had not received the labor peace for which he had paid and that he wanted his money back. Castellano was evidently aware during this time that Matthews had received nothing for his money, for his immediate response on May 5, 1983, when Giardina reported that Matthews had threatened to go to the authorities was neither a question nor a show of surprise, but rather a knowing "You know why, [Daly] robbed his money." Yet, despite the prior awareness that Matthews had been "robbed," apparently no member of the family made any effort to see that Matthews was repaid until Matthews threatened to go to the authorities. That threat, when communicated to Daly, resulted in Castellano's order the very next day for partial repayment. The jury was entitled to infer, both from the taped conversations and from the timing of the decision to make a repayment to Matthews, that the impetus for that decision was the desire to keep Matthews from "rat[ting]."

In sum, we conclude that the evidence supported Giardina's conviction under § 1510. Since Giardina's challenge to his conviction of RICO conspiracy depended on our overturning his conviction of aiding and abetting the Taft–Hartley violation or of obstruction under § 1510, we also uphold his RICO conspiracy conviction.

### D. *Daly's Challenge to His Sentence*

On each of the counts on which he was convicted, Daly received the maximum

punishment. He was sentenced to two one-year prison terms, to be served consecutively, and fines of $10,000 on each count, for a total of $20,000. *See* 29 U.S.C. § 186(d). Pointing out that he is 60 years old, that he had never before been charged with a criminal offense, and that several witnesses attested to his reputation for honesty and good character, he contends that his sentence is excessive. We find no basis for disturbing the sentence.

Under the principles applicable to Daly's appeal, a sentence that does not exceed the maximum provided by Congress is virtually unreviewable on appeal unless it was based on material misinformation or constitutionally impermissible factors. *See United States v. Tucker,* 404 U.S. 443, 446–47, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Dazzo,* 672 F.2d 284, 289 (2d Cir.), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). The sentencing judge is " 'under no obligation to give reasons for his sentencing decisions,' " *United States v. Vasquez,* 638 F.2d 507, 534 (2d Cir.1980) (quoting *McGee v. United States,* 462 F.2d 243, 247 (2d Cir.1972)), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed. 2d 620 (1981), and if he does not give reasons, we will not presume that he has based his decision on improper factors.

In sentencing Daly to the maximum prescribed by the statute, Chief Judge Weinstein did not state his reasons. Daly speculates that the court may have chosen to credit testimony by Matthews that he had made unlawful payments to Daly on numerous other occasions or may have been influenced by the evidence that Daly was an associate of the Gambino crime family. He argues that the evidence of his link to organized crime was weak and that Matthews's testimony was incredible. There is no basis on which we could conclude that Matthews's testimony was incredible as a matter of law, or on which we could deny the district court's discretion to take into account, and credit if he believed it creditworthy, all matters that had come to his attention during the trial, *see, e.g.,* 18 U.S.C. § 3577 (1982); *United States v. Grayson,* 438 U.S. 41, 50, 98 S.Ct. 2610, 2615, 57 L.Ed.2d 582 (1978); *United States v. Roland,* 748 F.2d 1321, 1327 (2d Cir.1984).

In sum, there is no basis upon which Daly's sentence may be disturbed.

## CONCLUSION

We have considered all of defendants' contentions in support of their respective appeals and have found them to be without merit. The judgments of conviction are in all respects affirmed.