UNITED STATES of America

v.

**Francesco GAMBINO.**

**Crim. No. 89–00003–01.**

United States District Court, E.D. Pennsylvania.

Nov. 9, 1989.

Michael M. Baylson, U.S. Atty., Michael L. Seigel, Strike Force Crim. Div., U.S. Dept. of Justice, Philadelphia, Pa., for plaintiff.

David Breitbart, New York City, for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is the motion of defendant Francesco Gambino for judgment of acquittal pursuant to Fed.R. Crim.P. 29. For the reasons set forth herein, defendant's motion will be denied.

## I. BACKGROUND

Defendant Francesco Gambino was indicted on three counts of conspiracy to violate the federal narcotics laws. Count one charged a broad conspiracy to import multi-kilogram quantities of heroin from Sicily, Italy to the United States from in or about January 1984 to December 1, 1988 in violation of 21 U.S.C. § 963. Count two charged a conspiracy to distribute the heroin during the same period in violation of 21 U.S.C. § 846. Count three charged a conspiracy to distribute multi-kilogram quantities of cocaine from in or about January 1985 to December 1, 1988 in violation of 21 U.S.C. § 846. Gambino was tried before a jury with six codefendants and found guilty on counts one and two.[1]

At the close of the government's case, defendant Gambino made a motion under Fed.R.Crim.P. 29 for judgment of acquittal on all counts.[2] Defendant alleged that hearsay testimony provisionally admitted under the coconspirator declaration exception to the hearsay rule set forth in Fed.R. Evid. 801(d)(2)(E) was inadmissible since the government had failed to prove by a preponderance of the evidence that Gambino was a member of the conspiracies outlined in the indictment. Defendant further argued that if the hearsay declarations were inadmissible, the government lacked sufficient evidence to sustain a conviction. The court denied the motion without prejudice to renew at the close of all the evidence.

At the close of the evidence, defendant renewed his motion under Rule 29. The court granted the motion and entered judgment of acquittal on count three, but reserved ruling as to counts one and two until the post-verdict stage.[3] The case against Francesco Gambino was then sent to the jury on counts one and two and a verdict of guilty was returned on both counts.[4] Defendant Gambino now moves the court to revisit his motion under Rule 29.

1. On January 3, 1989, the grand jury returned an eighteen defendant, twenty count indictment which charged defendant Gambino with the three conspiracy counts set forth above. The court severed the cases against defendants Filippo Filiberto, Salvatore DiMaio, Francesco Badalamenti, Antonio Romano, Salvatore Pilliteri and Frank Sciarrino and conducted a four week trial in April 1989. This trial resulted in convictions against all defendants on various counts, including count three charging the conspiracy to distribute cocaine. Since the court granted defendant Gambino's motion under Rule 29 as to count three, these convictions are irrelevant for purposes of this motion.

   On June 5, 1989, the grand jury returned a superseding indictment adding defendant Domenico Mannino to counts one, two and three. On July 19, 1989, trial commenced against the seven remaining defendants (including Francesco Gambino) who had neither pled nor fled the country.

2. Fed.R.Crim.P. 29(a) provides, *inter alia,*:

   The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses....

3. This action is expressly permitted by Rule 29(b), which provides:

   If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

4. Defendants Ignazio Antonino Mannino, Emanuele Salvatore Mannino and Grace Pulitano Mannino were likewise convicted on counts one and two. Defendant Enzo Varisco was acquitted on count two and convicted on count three. Defendant Carlo Fodera was acquitted on counts two and three. Defendants Emanuele Salvatore Mannino and Grace Pulitano Mannino were also convicted for violating the money laundering statute, 18 U.S.C. § 1956. Finally, defendant Robert Ryers pled guilty to count three during trial.

## II. DISCUSSION

### A. Admissibility of Coconspirator Declarations

Federal Rule of Evidence 801(d)(2)(E) states, "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Steeped in principles of agency law, the exception was rooted in the proposition that:

> When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made a "partnership in crime". What one does pursuant to their common purpose, all do, and as declarations may be such acts, they are competent against all.

*Van Riper v. United States,* 13 F.2d 961, 967 (2d Cir.), *cert. denied,* 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926) (L.Hand, J.), *quoted in,* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E)[01], at 801–233 (1988). *See also United States v. Trowery,* 542 F.2d 623, 626–27 (3d Cir.1976) (per curiam), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977).

Prior to the enactment of the Federal Rules of Evidence in 1975, this coconspirator declaration exception to the hearsay rule required proof *aliunde,* or independent evidence apart from the hearsay statement itself, sufficient to establish that both the declarant and the defendant were members of the alleged conspiracy and that the statement was made in its course and in furtherance of its goals. *See Glasser v. United States,* 315 U.S. 60, 74, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). The requirement of independent proof stood guard against the unbridled use of vicarious admissions in conspiracy cases, lest the hearsay "lift itself by its own bootstraps to the level of competent evidence." *Glasser,* 315 U.S. at 75, 62 S.Ct. at 467. *See also Unit-*

*ed States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

In *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) the Supreme Court found that the enactment of the Federal Rules of Evidence fundamentally changed the law in this area. After establishing that it is the province of the *court* to determine by a *preponderance of the evidence* whether the defendant and the declarant were members of the alleged conspiracy and whether the hearsay statement was made during its course and in furtherance of its goals, Chief Justice Rehnquist's opinion for the Court went on to hold that Federal Rules of Evidence 104(a)[5] and 1101(d)(1)[6] overruled *Glasser*'s requirement of proof *aliunde* as a strict condition of admissibility. 107 S.Ct. at 2780–82. The Court stated that "Rule 104 ... allow[s] the court to make the preliminary factual determinations relevant to Rule 801(d)(2)(E) by considering *any* evidence it wishes, unhindered by considerations of admissibility." 107 S.Ct. at 2780 (emphasis added).

The *Bourjaily* Court confronted *Glasser*'s bootstrapping argument on two distinct levels. First, the Court stated that it was bound by conventional methods of statutory interpretation:

> It would be extraordinary to require legislative history to *confirm* the plain meaning of Rule 104. The Rule on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.

107 S.Ct. at 2780 (emphasis in original). Next, the Court explained the reasoning behind the rule:

> First, out-of-court statements are only *presumed* unreliable. The presumption may be rebutted by appropriate proof....

---

**5.** Federal Rule of Evidence 104(a) provides, *inter alia,:*

> Preliminary questions concerning the ... admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

**6.** Federal Rule of Evidence 1101(d)(1) provides:

> (d) Rules inapplicable. The rules (other than with respect to privileges) do not apply in the following situations:
>   (1) Preliminary questions of fact. The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104.

Second, individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.

*Id.* at 2781 (emphasis in original).

The important question left unanswered by *Bourjaily* is the extent to which hearsay statements may provide the sole inculpation of a defendant in a conspiracy for purposes of admissibility under 801(d)(2)(E). *Bourjaily,* 107 S.Ct. at 2781–82 ("We need not decide in this case whether the courts below could have relied solely upon [ ] hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence."). Although this inquiry is technically unnecessary since the court finds that the "sum of the evidentiary presentation" was sufficient to meet the preponderance standard, the court believes that the incriminating nature of the hearsay statements in this case warrants further discussion of this topic.

Prior to *Bourjaily,* the Third Circuit had joined the majority of Courts of Appeals in holding that Rule 104 had not supplanted *Glasser*'s requirement of proof *aliunde.* *See United States v. Ammar,* 714 F.2d 238, 245–47 & n. 3 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Continental Group, Inc.,* 603 F.2d 444, 457 (3d Cir. 1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).[7] Rather, the court was persuaded that *Glasser*'s bootstrapping rationale continued to require a "clear preponderance of evidence independent of the hearsay statement to satisfy the judge that the declarant was a participant [in the conspiracy]." *Trowery, supra,*

542 F.2d at 627. This court has found no Third Circuit authority discussing whether *Bourjaily* permits district courts to rely exclusively on the hearsay statements themselves to determine their admissibility, or, in the alternative, the degree to which the hearsay must be corroborated by independent evidence sufficient to satisfy the sum of the evidentiary presentation.[8] Other circuits have required corroborative evidence, *United States v. Dworken,* 855 F.2d 12, 25 (1st Cir.1988), *United States v. Daly,* 842 F.2d 1380, 1386 (2d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *United States v. Leavis,* 853 F.2d 215, 219–20 (4th Cir.1988); *United States v. Zambrana,* 841 F.2d 1320, 1343–47 (7th Cir.1988); *United States v. Garbett,* 867 F.2d 1132, 1134 (8th Cir.1989); *United States v. Gordon,* 844 F.2d 1397, 1402 (9th Cir.1988), and such a conclusion was certainly envisioned by the *Bourjaily* court itself. As explained by Justice Stevens in his concurrence:

An otherwise inadmissible hearsay statement cannot provide the sole evidentiary support for its own admissibility-it cannot lift itself into admissibility entirely by tugging on its own bootstraps. It may, however, use its own bootstraps, together with other support, to overcome the objection.... This interpretation of *Glasser* as requiring some but not complete proof *"aliunde,"* is fully consistent with the plain language of Rule 104(a).

107 S.Ct. at 2783–84 (footnotes omitted).

■■■ This court finds the logic of Justice Stevens' concurrence compelling. Taken in conjunction with decisions in other circuits and prior Third Circuit jurisprudence in this area, as expressed in *Ammar,* the court finds that federal law mandates that cocon-

---

7. From the court's discussion in *Ammar,* it appears that only the Sixth Circuit anticipated the Supreme Court's holding in *Bourjaily.* 714 F.2d at 246 n. 3, *citing, United States v. Vinson,* 606 F.2d 149, 153 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). However, the First Circuit's decision in *United States v. Martorano,* 561 F.2d 406, 408 (1st Cir. 1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978) similarly called *Glasser*'s "vitality" into question. *See* Note, *Bourjaily v. United States: A New Rule for Admitting Cocon-*

*spirator Hearsay Statements under Federal Rule of Evidence 801(d)(2)(E)* 1988 Wisc.L.Rev. 577, 582–83.

8. In *United States v. Levy,* 865 F.2d 551 (3d Cir.1989), the Third Circuit noted that *Bourjaily* had changed the *Ammar* standard, but found disposition of the issue unnecessary since the independent evidence before the court was sufficient to satisfy the higher evidentiary burden under *Ammar. Id.* at 553.

spirator hearsay statements be corroborated by some independent evidence before they can be admitted under Fed.R.Evid. 801(d)(2)(E). This, however, does not end the inquiry. Since the sum of any evidentiary presentation is, by definition, *sui generis*, the quantum of independent evidence necessary to meet the preponderance standard is not subject to a precise calculus. Consequently, the court must evaluate all the relevant evidence in this case to determine if the standard has been met.

### B. The Evidence Against Francesco Gambino

■ To understand the evidence against Francesco Gambino, a brief overview of the government's case is required. The indictment charged defendant Gambino with being a ranking member in the Sicilian Mafia who supervised the importation of heroin from Italy and its subsequent distribution throughout the New York/New Jersey/Pennsylvania area during January 1985 to December 1988. The *modus operandi* of the importation scheme, as described by government witness Salvatore Allegra, consisted of the use of couriers who would conceal heroin on their person in Sicily and transport it to its entrepot, New York, via international commercial flights. The couriers would be met in New York by a member of the conspiracy who would take the heroin and provide the couriers with cash payments. The cash was then transmitted to the heroin's Sicilian sources through the couriers' return flight.[9]

Allegra testified that in early 1985 he was recruited for this operation by Tommaso Scalici, who eventually introduced him to the operation's immediate supervisor, Simone Zito-an indicted coconspirator and fugitive from justice. Zito initially oversaw the operation in Sicily but then moved to the receiving end in the United States, where he teamed up with defendant Ignazio Antonio "Tony" Mannino. The evidence at trial showed that Simone Zito and Tony Mannino continued to both coordinate the importation and arrange the distribution of heroin from their residences in Pennsylvania through the end of 1988.

To avoid detection by law enforcement,[10] Zito and Mannino used pay telephones to communicate with coconspirators. Specific public phones between Pennsylvania and New York were designated through coded conversations. The government alleged, and the jury found, that the conspirators used the Mannino residence as an information clearing house. Coconspirators would call the Mannino residence and be given information as to times and locations where Tony Mannino and Simone Zito could be contacted.

The jury also found that Simone Zito and Tony Mannino worked for Francesco Gambino. The evidence showed that Zito and Mannino would travel to the Cafe Giardino in Brooklyn, New York on an almost daily basis. Government witness William Kane testified that he was present at the Cafe daily between 1986 and 1988 and that he observed Francesco Gambino there on numerous occasions. The government contends that Zito and Mannino met with Gambino in and around the Cafe Giardino to discuss their narcotics trafficking and to receive further instructions. To support these allegations, the government offered both independent evidence and the hearsay statements of cooperating witnesses which are the subject of this motion.

Clearly the most incriminating evidence against Gambino was a hearsay statement by Tony Mannino to government witness William Kane during their negotiations over the sale of heroin. Kane testified that

---

**9.** The indictment alleged that large quantities of cocaine were eventually shipped to Sicily from South America and the Caribbean as barter for the imported heroin. The government introduced evidence of a Columbian cocaine shipment in excess of 500 kilograms which left Aruba by freighter and rendezvoused with a fishing boat off the coast of Sicily some time in January of 1986. The evidence suggests that this shipment was paid in cash, and not as barter; however, testimony indicated that such barter transactions were contemplated for future shipments.

**10.** The telephones at the residences of Simone Zito and Tony Mannino were wiretapped intermittently pursuant to court order.

in October of 1987 Simone Zito had approached him about a $25,000 loan which Zito needed for a downpayment on a townhouse in Pennsylvania. Kane stated that he would lend Zito the money if he would post a kilogram of poor quality heroin, which the two had been bargaining over, as collateral. Zito agreed.

On October 21, 1987, Kane met Zito at a diner in Cherry Hill, New Jersey. Kane testified that upon entering the diner, Zito stuffed a brown paper bag containing the heroin into Kane's pocket. The two proceeded to the men's room where they searched each other for concealed recording devices. Kane then told Zito that he did not bring the cash and that he was angry because he believed Zito had him followed and he was not used to such abrupt treatment. The two then agreed to meet the next day to exchange the cash.

On October 22, 1987, Kane met Zito at the same New Jersey diner. The two once again entered the men's room and exchanged the cash. Also present at the diner was defendant Tony Mannino. After a brief argument over the price of the sale, Kane and Mannino discussed their operations. Kane told Mannino that he worked for Giuseppe Gambino, the owner of the Cafe Giardino, and that he had extensive cocaine connections in Florida. Kane testified that Mannino responded that he and Zito were "with 'Cheech' [Francesco] Gambino".[11]

Under the pre-*Bourjaily* standard, this extremely incriminating hearsay statement by a conspirator linking a fellow defendant to the conspiracy would be irrelevant in determining its own admissibility under Rule 801(d)(2)(E). Under the liberal interpretation of *Bourjaily*, this statement could be sufficient by itself to permit its admission to the jury. The court believes that this latter interpretation of *Bourjaily* would be the logical equivalent of the Queen of Hearts call for "sentence first-verdict afterwards." L. Carroll, *Alice's Adventures in Wonderland* (Oxford University Press 1983), at 165. Moreover, it would usurp the screening function of the court and encourage the manufacture of testimony in criminal conspiracy cases. The better view requires the government to present independent evidence which corroborates the hearsay's inference that a defendant was a coconspirator of the hearsay declarant. In this case the government's evidence met this burden.

First, the government offered a series of F.B.I. surveillance photographs showing Gambino in the presence of coconspirators during the period of the conspiracy. The government concedes that none of the photographs depict criminal activity. Instead, they were offered to prove association between Gambino and fellow conspirators. It is black letter law that mere association cannot alone support a conspiracy conviction. "On the other hand, the timing and circumstances of a meeting or series of meetings may be sufficiently suspicious to permit a reasonable inference of complicity in the criminal enterprise." *Ammar, supra*, 714 F.2d at 250 (citations omitted).

The majority of the photographs showed Gambino socializing with friends and relatives in the Sicilian community and therefore are of minor evidentiary value. However, others showed Gambino in the presence of Tony Mannino and Simone Zito during key periods of the conspiracy. Although Gambino and Mannino are related by marriage and were frequently seen in

---

**11.** Gambino's counsel vigorously objected to the introduction of this testimony at trial. He argued that the official Federal Bureau of Investigation report, commonly known as an FD–302, summarizing the case agents debriefing of Kane after this meeting did not make reference to this hearsay statement. Indeed, an FD–302 of July 17, 1989 summarizing a pretrial interview with Kane indicates that the government attorney first became aware of this statement during this July 17 interview. The government attorney noted this error to the agents, who were present during both the October 22 and July 17 debriefings, and directed them to file a supplemental report to include the statement by Mannino. Defense counsel argues that this unusual sequence of events proves that Kane's testimony in this regard was perjured and therefore inadmissible. The court does not agree. To the extent that Rule 104 and *Bourjaily* requires the court to make initial findings of fact, the court believes that Kane's testimony is credible for purposes of admissibility under Rule 801(d)(2)(E) and should be weighed by the jury.

each other's company, the surreptitious conduct charged in this case necessarily permits the jury to draw reasonable inferences as to whether these meetings were truly social or were subterfuge designed to obscure illicit conduct. Thus, taken as a whole, the court finds that the surveillance photographs are probative independent evidence of Francesco Gambino's membership in the conspiracies charged in counts one and two of the indictment and were properly submitted to the jury.

Second, the government offered into evidence transcripts of intercepted telephone conversations between defendant Gambino, Tony Mannino and Tony's wife, Grace Pulitano Mannino.[12] The content of these conversations invariably centered on when Tony Mannino would be arriving in Brooklyn. Often, Tony Mannino was not home and Grace Mannino passed on information as to his whereabouts. The government contends that the curt and disjunctive nature of these conversations indicate that the parties were using coded messages to arrange meetings without detection, while defendants attribute this to the vagaries of translation from Sicilian to the English language.

In either case, the conversations are of the same probative value as the surveillance photographs discussed above and, in several instances, confirm meetings in Brooklyn which were the subject of those photographs. Once again, a telephone call to a Pennsylvania relative or acquaintance to arrange a meeting in Brooklyn, New York, despite its unusual frequency, is of minimal evidentiary value and is certainly insufficient to create proof *aliunde* of a conspiracy. However, the court does find that this evidence corroborates Mannino's hearsay statement to Kane and supports other evidence of Gambino's role in the conspiracy. It is therefore properly included in the evidentiary melange which the court may consider under *Bourjaily*.

Third, the government presented the testimony of Robert Ryers. Ryers was originally a defendant in this case. During the course of the trial, he pled guilty to count three and later testified on behalf of the government. Ryers, the finance manager of a New Jersey car dealership, testified that during the summer of 1987 he became involved with Simone Zito through William Kane, who had been a customer of the dealership since 1986. Kane was then negotiating with Simone Zito and Tony Mannino for the purchase of heroin. In an attempt to further ingratiate himself with Zito, Kane approached Ryers about financing Zito's purchase of a Mercedes–Benz automobile. After reviewing Zito's finances, Ryers agreed to assist in sheltering Zito's drug profits by placing him on the payroll of Kane's vending machine company. The three had numerous meetings through the end of 1988 during which time Zito informed Ryers of the scope of his narcotics trafficking operations.

Ryers provided one additional link in the chain conspiracy which implicates Francesco Gambino. Throughout 1987 and into early 1988, Ryers began to inform Kane of an ongoing grand jury investigation into international narcotics trafficking being conducted in the Eastern District of Pennsylvania. Ryers obtained this secret information through his wife, who was the court reporter for the grand jury. Ryers warned Kane, and later Zito, that the government's investigation seemed to be focusing on their activities and that he was privy to further developments. Ryers testified that, in response to this information, Zito handed him a list containing four names: Simone Zito, Ignazio Mannino, Domenic Mannino and Francesco Gambino. Zito told Ryers that if any of these names came up in the grand jury he was to inform Zito immediately.

Although the government was unable to offer the list at trial, the testimony of

12. These conversations took place in Sicilian and, therefore, were not played for the jury. Instead, they were read by script readers from transcripts translated and prepared by the government. The court believes that this method of communicating this particular evidence to

the jury was straightforward and nonprejudicial, and the extent to which defendants object to this procedure, such motion is denied pursuant to the Third Circuit's decision in *United States v. Theodoropoulos,* 866 F.2d 587 (3d Cir. 1989).

Ryers is nonetheless independent circumstantial evidence of Gambino's membership in the conspiracy. Ryers' testimony regarding his disclosure of confidential grand jury matters and the circumstances under which he received the list is nonhearsay testimony which is admissible against Gambino as probative evidence of his involvement with Simone Zito and Tony Mannino in the very conspiracies giving rise to the indictment in this case.

Fourth, the government presented the testimony of Filippo Ricupa, an unindicted coconspirator in counts two and three of the indictment. Ricupa came to the United States from Italy in 1966 and became a barber in the Brooklyn area. In exchange for a payment of gambling debts, Ricupa took three trips to Italy between 1975 and 1979 with one Filippo Ragusa. On each trip, Ricupa concealed large sums of currency ranging up to $150,000. On his last trip in 1979, Ricupa testified that he smuggled heroin into the United States.

By 1983, Ricupa began distributing heroin. His major source of supply was Salvatore DiMaggio, who had been introduced to Ricupa through Filippo Ragusa. Ricupa testified that DiMaggio would give him kilogram quantities of heroin on consignment for approximately $195,000 per kilogram. Ricupa would distribute the heroin to his sources and repay DiMaggio after his sources made their sales. Ricupa's major customer for this heroin was Ricky Santiago.

Ricupa testified that in the summer of 1985, he received a telephone call from DiMaggio directing him to collect all the money he could locate for an emergency shipment to Sicily. After some recalcitrance, Ricupa obtained approximately $100,000 from Santiago and brought it to DiMaggio's Brooklyn restaurant. Ricupa stated that he handed the cash to DiMaggio in two small brown paper bags. DiMaggio took the money and went upstairs. He returned several minutes later with one large brown shopping bag and placed it in the back of an automobile waiting in front of the restaurant. Ricupa testified that he recognized the man in the automobile to be Francesco Gambino, a customer in his barbershop.[13] The court finds that this testimony corroborates Mannino's hearsay statement and Gambino's role in the conspiracy.

Lastly, William Kane testified that he met with Simone Zito at the Cafe Giardino in March of 1988. At that meeting, Kane stated that Zito offered him a kilogram of purer quality heroin for $190,000. When Kane countered with a $150,000 offer, Zito went to the back of the room to get approval. Zito then told Kane that the price was negotiable and that he would obtain a sample of the heroin to give to Kane. Although Kane admitted that he could not see who Zito spoke with, he testified that a reconnoiter of the cafe revealed that Francesco Gambino was the only nonemployee present at the time. Kane thus concluded that Zito was reporting to Gambino about the terms of their drug deal. The court finds this to be independent corroborative evidence of Gambino's membership in the conspiracy.

A cumulative review of this evidence against Francesco Gambino placed in its proper evidentiary context corroborates the hearsay statement by defendant Tony Mannino and makes the existence of defendant Gambino's membership in the conspiracies set forth in counts one and two of the indictment "more probable than its nonexistence", see *United States v. Trotter*, 529 F.2d 806, 812 n. 8 (3d Cir.1976). Since the requirements of *Bourjaily* have been met, the evidence was properly submitted to the jury.

## III. CONCLUSION

In sum, the United States Supreme Court's decision in *Bourjaily v. United*

---

**13.** Defense counsel objected to this testimony of Ricupa on the grounds that it was inadmissible hearsay since Ricupa had, at one point, stated that DiMaggio told him it was Gambino and that he had not recognized him directly. Ricupa, who testified through a Sicilian interpreter, was certainly inconsistent on this point. However, insofar as Ricupa's testimony could be characterized as hearsay, the court finds that it was sufficiently corroborated by the independent evidence in this case and was, accordingly, admissible.

*States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) permits district courts to consider hearsay declarations themselves in determining whether the government has established by a preponderance of the evidence that a defendant is a member of the alleged conspiracy for purposes of admissibility under Fed.R.Evid. 801(d)(2)(E). However, this court follows the majority of circuit courts which interpret the *Bourjaily* holding as requiring some independent corroborative evidence of a defendant's conspiratorial conduct before the coconspirator hearsay can satisfy the preponderance standard. In this case, the court finds that the direct testimony of William Kane, Robert Ryers and Filippo Ricupa, coupled with the government's surveillance photographs and transcripts of intercepted telephone conversations, corroborates coconspirator Ignazio Antonino Mannino's statement that he was working with defendant Gambino and establishes by a preponderance of the evidence that Francesco Gambino was a member of the conspiracies outlined in counts one and two of the indictment. This sum of the government's evidentiary presentation was properly sent to the jury. Gambino's motion for judgment of acquittal pursuant to Fed. R.Crim.P. 29 is, accordingly, denied.

An appropriate order will be entered.