UNITED STATES of America, Appellee,

v.

John F. LONG and John S. Mahoney, Defendants–Appellants.

Nos. 998, 999, Dockets 89–1227, 89–1392.

United States Court of Appeals, Second Circuit.

Argued March 28, 1990.

Decided Oct. 19, 1990.

See also 697 F.Supp. 651.

Colleen P. Cassidy, The Legal Aid Soc., New York City, for defendant-appellant John F. Long.

Lawrence M. Stern, New York City, for defendant-appellant John S. Mahoney.

Joan McPhee, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Jonathan Rosenberg, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES and WINTER, Circuit Judges, and MUKASEY,* District Judge.

WINTER, Circuit Judge:

Appellants John F. Long and John S. Mahoney were Teamsters officials in New York City who allegedly misused their offices for private profits. After a twelve-week jury trial before Judge Edelstein, they were convicted of participating in and conspiring to participate in a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d) (1988), and a variety of other substantive crimes connected with or arising out of the racketeering activity.

Appellants raise numerous issues, including errors in instructions to the jury, im-

---

* The Honorable Michael B. Mukasey, United States District Judge for the Southern District of New York, sitting by designation.

proper admission of unsealed surveillance tapes and hearsay evidence on those tapes, improper admission of expert testimony on organized crime, insufficiency of evidence on various counts, improper questioning of character witnesses using hypothetical questions assuming the guilt of the defendants, and judicial bias.[1] The district court's instructions regarding the pattern element of RICO, while proper at the time they were given, were not consistent with an intervening decision of this court and were not harmless error. We also agree that instructions regarding the testimony of Long's wife were erroneous and that the district court improperly admitted prejudicial expert testimony regarding organized crime families. Finally, the questioning of character witnesses in the form of hypothetical questions assuming the guilt of the defendants was improper. Accordingly, we reverse.

## BACKGROUND

Appellants were indicted in 1988 on charges of participating in a racketeering enterprise by committing and agreeing to commit numerous crimes between 1978 and 1987. The enterprise alleged was an association in fact consisting of Long, Mahoney, Jesse David Hyman, Vincent Joseph Rotondo, and "others to the Grand Jury known and unknown." Both appellants were charged with conspiring to participate in (Count I) and participating in (Count II) the racketeering enterprise in violation of RICO, 18 U.S.C. §§ 1962(c) and (d).

The indictment contained ten other counts alleging substantive offenses, including extortion, filing false tax returns, perjury and false statements under oath. Because the claims of error implicate the statute of limitations and the prejudicial effect of certain rulings, a fairly detailed description of the evidence is necessary.

The government's proof focused on the criminal activities of Hyman, a dentist who was convicted of extortion and loanshark-ing in 1985 and thereafter became the government's key witness in this case. Hyman testified that he had previous associations with various organized crime families in Buffalo, paying the families a percentage of profits on union dental care plans that Hyman set up with the backing of the families. When he moved his criminal activities to the New York area, Hyman developed a relationship with Rotondo, a member of the DeCavalcante organized crime family in New Jersey.

In 1979, Rotondo arranged for a contractor, Ben Parness, with whom Rotondo had an extortionate relationship described *infra,* to introduce Hyman to Long, the Secretary–Treasurer of Teamsters Local 804 in New York City. Hyman indicated to Long that he was a partner of Rotondo, and Rotondo attended a few meetings between Hyman and Long. Hyman proposed a dental plan for Long's union and requested that Long suggest other Teamsters locals that might be interested in dental plans or pension funds.

Long thereafter introduced Hyman to Mahoney, who was Secretary–Treasurer of Teamsters Local 808. Hyman reported to Rotondo and Rotondo's superior John Riggi, then acting boss of the DeCavalcante family, that Mahoney was willing to discuss business together. Rotondo responded, "[i]f you could do it, God bless you. Nobody has been able to move Mahoney up until now." Hyman told Mahoney that Hyman and Rotondo were partners. Hyman testified, however, that Mahoney emphasized that he intended to do business only with Hyman. Hyman shared the proceeds from the resulting criminal activities with Rotondo and Riggi.

The alleged pattern of racketeering activity, *see* 18 U.S.C. §§ 1961(1) and (5), consisted of nine racketeering acts, five involving Long alone, one involving Mahoney alone, and three involving Long and Mahoney.[2] All but three of the nine acts oc-

---

1. Mahoney also challenges his sentence, arguing that his sentence enhancement was based on insufficient evidence and that he was denied a fair hearing on that issue. These claims are mooted by our reversal.

2. Although Mahoney was initially charged with Long in Racketeering Act Six, the government

curred outside the limitations period and must, under RICO, *see infra,* be related to at least one of the three acts within the period to be valid predicate acts.

Racketeering Act One, which occurred outside the limitations period, charged Long with receiving at least $2,000 in kickbacks in 1981 for arranging for Teamsters Local 804 to invest funds in Penvest, a pension fund management company. Hyman testified that he agreed to pay Long a one percent cash kickback for monies invested by Local 804 in Penvest. After Long gave Hyman a check for $100,000 for Penvest, Hyman gave Long $2,000 in cash, or a two percent kickback, to encourage Long's continuing participation in the scheme. According to Hyman, eight or nine months later, Long invested additional Local 804 money with Penvest, and Hyman gave Long $1,000 in cash.

Racketeering Act Two, also outside the limitations period, charged Mahoney with receiving kickbacks between April 1982 and February 1983 in the form of cash and a bank loan in return for investing Local 808 funds with Penvest. That Act also charged Long with aiding and abetting Mahoney's wrongdoing by persuading Mahoney to make the investment and by accepting $5,000 from Hyman for vouching for Hyman to Mahoney. According to Hyman's testimony, Hyman offered Mahoney one percent of the total of union pension fund money invested with Penvest and assured Mahoney of making $30,000 to $40,000 per year. Hyman also testified that Mahoney had stated that he needed money to renovate a new home. Hyman said that he would give Mahoney $10,000 in cash up front and enable Mahoney to get a home improvement loan for the balance.

When the first investment installment was transferred to Penvest in the spring of 1982, Hyman gave Mahoney $10,000 in cash. Hyman also paid Long $5,000 in cash for introducing Hyman to Mahoney and made cash payments to Rotondo and

Riggi. In addition, Hyman testified that he arranged for Mahoney to receive a $20,000 home improvement loan from Sterling National Bank[3] and gave Mahoney approximately $700 per month in cash to cover the payments on that loan until February 1983.

Racketeering Act Three, again outside the limitations period, charged Mahoney with receiving a $5,000 cash payment in December 1982 for agreeing not to remove Local 808 funds from Penvest. Long also was charged in Act Three with aiding and abetting Mahoney's receipt of the $5,000 and with receiving $2,000 himself for his efforts to persuade Mahoney to keep the pension fund money in Penvest. During the summer of 1982, Local 808 officials had complained about Penvest's failure to provide financial reports and other documentation regarding Local 808 pension funds. In the fall, Mahoney wrote to Penvest requesting that all funds and assets belonging to the union pension fund be returned. Hyman testified that he contacted Long and asked Long to help persuade Mahoney not to withdraw the funds. Hyman testified that on December 6, 1982, he paid Mahoney $5,000 in cash and assured Mahoney that the union would get the financial reports it needed. Mahoney then indicated that the local would make an additional investment in Penvest of $100,000. Hyman testified that shortly after this matter was resolved with Mahoney, Hyman gave Long approximately $2,000 in cash. Penvest received an additional $100,000 investment from Local 808 in early 1983.

Racketeering Act Four, also outside the limitations period, charged Long with receiving kickbacks in 1981 for persuading an official in Teamsters Local 277 to invest union pension funds in American Asset Management Company ("AAMC"), another investment management fund. Hyman testified that in 1978 or 1979 he developed a relationship with various employees of a New York City brokerage house who

withdrew the charge as to Mahoney prior to the conclusion of its direct case.

**3.** Hyman testified that he arranged for the loan application to be submitted to a particular loan

officer and that he had his company's lawyer write a letter to the bank to explain away a problem in Mahoney's credit report.

would handle stock trading for pension funds managed by AAMC. Hyman and one broker agreed that they would split the broker's commissions. A one percent cash "fee" to the union people who assisted Hyman in getting the funds invested with AAMC would be covered out of the pension fund management fees. Hyman spoke with Rotondo, Long, and other union contacts to seek business for AAMC. According to Hyman, Long was instrumental in getting an officer of Teamsters Local 277 interested in AAMC, and, when Local 277 placed its pension funds with AAMC, Long received a $2,500 cash payment from AAMC through Hyman.

Racketeering Act Five, also outside the limitations period, charged Long with receiving money in 1981 for assisting Emgee Pharmaceuticals, Inc., to avoid unionization. A principal of Emgee Pharmaceuticals had contacted Hyman regarding threats from AFL–CIO organizers, and Hyman sought Long's assistance in resolving the situation. Hyman testified that he later gave Long cash for appeasing the AFL–CIO organizer and for agreeing to provide Emgee Pharmaceuticals with a "sweetheart contract" between the corporation and Local 804.

Racketeering Act Six, outside the limitations period, charged Long with receiving payments in 1979 and 1980 for assisting the principals of Bottom Sportswear, Inc., to avoid unionization and picketing. Hyman testified that he paid Long $3,500 for helping Hyman resolve an attempt at union organization at Bottom Sportswear by arranging for a sweetheart Teamsters contract in 1979 and for other assistance in 1980.

Racketeering Act Seven, which was within the limitations period, charged Long with extorting payments from maintenance contractor Parness from 1978 until 1987 for assistance that Long provided in getting Parness's company a maintenance contract with United Parcel Service ("UPS"), whose workers were represented by Long's local. Parness, who testified pursuant to an immunity agreement with the government, stated that in the mid–1970's he had

expressed to his friend, Long, interest in getting a janitorial contract with UPS. When UPS was seeking to hire outside contractors, Long told Parness to write to UPS and have his business placed on the bidding list. Parness's company submitted a bid and got a contract in 1974. According to Parness, his payments to Long ceased when his company went into bankruptcy in 1976, but another company he owned took over the UPS contracts and resumed cash payments to Long in 1978. Parness testified that in 1978 he arranged to put Long's wife, Olga, on the payroll in a "no-show" job in lieu of the cash payments to Long.

Parness's relationship with Long thus substantially predated the formation of the racketeering enterprise focusing on Hyman's activities. Parness testified that he had met Rotondo at a social function and introduced him to Long. Rotondo then introduced Parness to Hyman, and asked Parness to introduce Hyman to Long. The government contends that Long's extortion of Parness became part of the enterprise's racketeering activity. However, this contention is not heavily supported by the record. Parness testified that starting in 1978 or 1979 he made cash payments to Rotondo in connection with a contract Parness's company obtained at a housing development in Staten Island. Hyman testified that Long told Hyman about Long's receipt of payments from Parness and suggested that there was an opportunity to make money by getting contracts for Parness's company. He also testified that Rotondo stated that Rotondo and Long had jointly assisted Parness with a labor problem and partly as a result of this assistance had gotten Rotondo and Rotondo's son-in-law on Flair Maintenance's payroll. However, there appears to have been no evidence that Hyman ever acted on Long's invitation to get involved in the extortion of Parness.

Racketeering Act Eight, within the limitations period, charged Mahoney with obstructing a federal grand jury inquiry when he appeared before it on July 14, 1983. The government contends that Mahoney lied to the grand jury about the

events alleged in Racketeering Acts Two and Three.

Racketeering Act Nine, within the limitations period, charged Long with obstructing justice by making false and misleading statements to a federal grand jury on May 26, 1983. The government contends that Long falsely denied to the grand jury that Hyman had offered Long money for investing union funds in Penvest.

In addition to the racketeering charges, the indictment charged Long and Mahoney with numerous substantive crimes set out in the margin,[4] that largely mirrored the charged RICO predicate offenses but also included false tax return charges relating to Mrs. Long's "no-show" job with Parness.

Long and Mahoney were convicted on the two RICO counts. Long was convicted on Count Three and Counts Seven through Twelve of extortion, making false declarations before the grand jury, perjury, and filing false federal income tax returns. He was acquitted of Racketeering Act Six, the Bottom Sportswear charge. Mahoney was convicted of making false declarations before the grand jury (Count Four) and perjury (Count Five). He was acquitted on the Count Six charge of perjury in a 1984 deposition.

## DISCUSSION

### 1. *The RICO "Pattern" Charge*

Appellants argue that the district court's charge on the RICO pattern requirement, which did not require the jury to find relatedness between at least two predicate acts, was prejudicial error. We agree. Appellants were convicted of violating, and conspiring to violate, 18 U.S.C. § 1962(c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c) (1988). A "pattern" of racketeering activity is defined in the RICO statute as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1988).

At the time of trial, the law in this circuit was that the commission of two racketeering acts furthering a RICO enterprise by themselves supplied the elements of relatedness and continuity necessary to find a RICO "pattern." *United States v. Ianniello*, 808 F.2d 184, 192 (2d Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987). Judge Edelstein therefore instructed the jury that it "need not find that these racketeering acts were related to each other." He stated that the acts had only to be "in some way related to the activities of the enterprise."[5] These

---

**4.** Count Three charged Long with extortion in connection with the payments from Parness to Long and his wife in violation of 18 U.S.C. §§ 1951 and 2. Count Seven charged Long with making false declarations before the grand jury on May 26, 1983, *see* 18 U.S.C. § 1623, and Count Eight charged him with perjury at a 1987 deposition during which he was questioned about whether Hyman had offered him any inducement to recommend his services to Mahoney, *see* 18 U.S.C. § 1621. Counts Nine through Twelve charged Long with filing false tax returns reflecting salary income for his wife from Parness's company in 1983, 1984, 1985, and 1986, in violation of 26 U.S.C. § 7206(1). Count Four charged Mahoney with making false declarations before the grand jury on July 14, 1983, *see* 18 U.S.C. § 1623, and Counts Five and

Six charged him with perjury during depositions in 1987 and 1984, *see* 18 U.S.C. § 1621.

**5.** The instructions stated:

[T]he government must prove beyond a reasonable doubt ... that the defendant conducted or participated in the affairs of the enterprise through a pattern of racketeering activity. A pattern of racketeering activity requires that the defendant in question committed at least two acts of racketeering within ten years of each other.

You need not find that these racketeering acts were related to each other. However, the government must prove beyond a reasonable doubt that either the racketeering acts were in some way related to the activities of the enterprise or that the defendant in question was able to commit the racketeering acts solely by

instructions were the subject of a pertinent objection. Less than a month after appellants' convictions, this court, sitting *en banc,* overruled *Ianniello* and held that

> proof of two acts of racketeering activity without more does not suffice to establish a RICO pattern; that the concepts of relatedness and continuity are attributes of activity, not of a RICO enterprise, and that a RICO pattern may not be established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity....

*United States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989); *see also H.J. Inc. v. Northwestern Bell Tel. Co.,* —— U.S. ——, 109 S.Ct. 2893, 2900–02, 106 L.Ed.2d 195 (1989). Under *Indelicato* and *H.J. Inc.,* therefore, the government must prove that two racketeering acts were related to each other ("horizontal" relatedness) as well as related to the enterprise ("vertical" relatedness) *and* that they resulted in or posed a threat of continuity of the criminal activity.[6]

■ In *United States v. Tillem,* 906 F.2d 814 (2d Cir.1990), and *United States v. Scarpa,* 913 F.2d 993 (2d Cir.1990), we addressed pre–*Indelicato* instructions based on *Ianniello* where defense counsel had not objected. In both cases, we held that the instruction was not plain error calling for a reversal in the absence of a contemporaneous objection. *See e.g. Tillem,* 906 F.2d at 824–26. In the instant matter, a timely objection was made, and we must now decide whether the failure to give an *Indelicato* relatedness instruction was prejudicial error.

■ The government argues that the charge as given sufficiently encompassed the relatedness requirement of *Indelicato* and therefore was not erroneous. The government's theory is that because the predicate acts had to be found to be related to the enterprise under the instructions giv-

en, the jury necessarily found interrelatedness among the acts. We disagree.

Although it may be, as the government argues, that the evidence is such that a jury could have found the predicate acts to be interrelated, we have no assurance that it did so, particularly since that instruction expressly stated that the acts did not have to be related to each other but only had to be "in some way related to the activities of the enterprise." *See supra* note 5. This plainly did not satisfy the *Indelicato* requirements of proof of both "horizontal relatedness" and threat of continuity of criminal activity.

The horizontal relatedness of the predicate acts is particularly critical in the instant matter because only three of the alleged racketeering acts fall within the statute of limitations period and, under RICO, each defendant must be convicted of at least one racketeering act committed within the statutory period. *See* 18 U.S.C. § 3282 (1988); *United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987) (to prove violation of Section 1962(c), at least one predicate offense must have occurred within five-year statute of limitations for noncapital offenses), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988).

The predicate acts that fall within the statutory period—Long's obstruction of justice, Mahoney's obstruction of justice, and Long's extortion of Parness—are the most vulnerable to a claim of horizontal unrelatedness, either to themselves or to the various kickback charges. Indeed, our recent decision in *United States v. Biaggi,* 909 F.2d 662, 685–86 (1990), held as a matter of law that the requisite RICO pattern could not be proven simply by showing an offense and a subsequent denial of that offense alleged as an obstruction of justice. We held that a crime and a denial of that crime constitute only sporadic rather than continuing criminal activity. A precise *Biaggi* objection—a single offense followed by a denial of the offense cannot as a

---

virtue of his position or involvement in the affairs of the enterprise.

6. *Indelicato* applies retroactively. *See Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

matter of law be a pattern—was not made in the district court. However, while the legal claim of insufficiency may have been waived, appellants preserved their right to a correct charge to the jury on the relatedness of an offense to a subsequent denial for purposes of proving a RICO pattern.[7]

The horizontal relatedness of the obstructions of justice to the earlier crimes was challengeable on other grounds. The obstructions might easily have been viewed as quintessentially solo acts of self-preservation rather than as part of, and related to, the extortion and kickback schemes. In addition, the threat of continuity of the enterprise's criminal activities posed by the obstructions of justice might have been deemed by the jury to be minimal or nonexistent because a continuation of those activities in the face of the ongoing investigation would have been foolhardy. Indeed, except for the Parness extortion, the various kickback schemes appear to have ceased well before the obstructions of justice.

Long's extortion of Parness, the evidence of which was barely sufficient to support a finding of guilt, *see infra* note 8, was also arguably unrelated to the other acts and to the enterprise. Parness was paying off Rotondo on some matters and introduced Rotondo to Long. Parness thereafter put Rotondo and Rotondo's son-in-law on the Flair Maintenance payroll in return for Rotondo's and Long's mutual assistance with a labor matter. Rotondo then had Parness introduce Long to Hyman for purposes of committing the various racketeering acts that are outside the limitations period. Long in turn invited Hyman to participate in getting kickbacks from Parness, although Hyman never availed himself of that particular opportunity. The Parness extortion thus played a role in the origin of the enterprise and was regarded by Long and Hyman as associated with their other kickback schemes, or so a trier of fact might find. Although sparse, the evidence of horizontal relatedness is thus legally sufficient in light of the elasticity of the pattern requirement. *See, e.g., United States v. Kaplan,* 886 F.2d 536 (2d Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990).

The fact that only three of the alleged Racketeering Acts are within the limitations period thus eliminates any possibility that the RICO pattern instruction was harmless. A pattern instruction containing the horizontal relatedness element was critical in the instant matter.

■ The RICO conspiracy counts must also be reversed. A conspiracy to violate Section 1962(c) requires that some member or members of the conspiracy engaged in, or agreed to engage in, a pattern of racketeering activity. *See* 18 U.S.C. §§ 1962(c) and (d). The erroneous RICO pattern instruction prevented the jury from validly determining whether the requisite pattern existed. In addition, although the statute of limitations for RICO conspiracy does not begin to run until the accomplishment or abandonment of the objectives of the conspiracy, *see United States v. Persico,* 832 F.2d at 713; *United States v. Bortnovsky,* 879 F.2d 30, 36 n. 11 (2d Cir.1989), erroneous pattern instructions may have caused the jury to find that the conspiracy continued to within five years of the indictment. Because the predicate acts within the limitations period were found to be part of a pattern on invalid instructions, the jury may also have mistakenly found that those acts were in furtherance of the conspiracy.

Accordingly, appellants' convictions on the substantive RICO and RICO conspiracy counts must be reversed.

### 2. *The Olga Long Instruction*

■ Long contends that the district court improperly instructed the jury regarding the testimony of his wife, Olga

---

**7.** Under *Biaggi,* it appears that a pattern of racketeering activity cannot be proven with regard to Mahoney because Racketeering Acts Two and three, outside the limitations period, involved the same subject matter as was the basis for the obstruction of justice charge, which is within the period. As for Long, a pattern finding cannot be based on a finding of relatedness between the obstruction of justice and Racketeering Act One, which involve the same subject matter.

Long, as a witness for the prosecution. Mrs. Long had been subpoenaed to testify before the grand jury, and she testified at trial that she had signed a cooperation agreement with the government under which she agreed to testify in exchange for immunity from prosecution. Her brief substantive testimony related to the Parness extortion charge and the false income tax filing charges.

In his summation, counsel for Long referred to Mrs. Long's nervous demeanor on the stand and stated, "Mrs. Long, you saw that nice, nice lady, good woman, put on the stand by the government.... The government gives her an immunity agreement, puts that lady on the stand." A few moments later counsel stated of Mrs. Long, "She's put on, again under an immunity agreement, if she didn't testify she'd be subject to prosecution...." The court interrupted *sua sponte* and instructed the jury, "You may ignore that last comment. Ignore it completely. I don't want to make any further comment on that score." The next morning, the court gave the jury the following instruction, which had been submitted by the government:

> During [Long's counsel's] summation he stated that Ms. Olga Long was subpoenaed. As you have heard during the trial, Olga and John Long are married and as a result of that relationship Olga Long could not and was not subpoenaed by the government at any time.
>
> Mrs. Long could not be compelled to testify against her husband and had the absolute right to refuse to testify. Mrs. Long chose to testify, appeared voluntarily and waived the marital privilege.

Long's counsel immediately objected. At the next recess, he moved for a mistrial and requested a further charge to the jury indicating that had Mrs. Long invoked her marital privilege she could have been in-dicted by the government. The motion and request were denied. That was error.

We see nothing improper in defense counsel's attempting to deflect the impact of Mrs. Long's appearance as a witness by arguing that it was a *quid pro quo* for her immunization against criminal charges, and the jury should not have been told to disregard it. Nevertheless, that ruling alone might amount to harmless error. However, the subsequent instruction to the jury conveyed the entirely false message that she had volunteered to testify against her husband even though she could have freely invoked the marital privilege. The instruction thus suggested that Mrs. Long was ready and willing to testify against her husband when, in fact, she was effectively compelled to do so to avoid prosecution and possible incarceration. Although the jury knew of the cooperation agreement, the instruction given by the district court invited the jury to disregard the plain implications of that agreement.

Such an instruction is in no sense harmless. Although the government contends on appeal that Mrs. Long's testimony was merely "cumulative," the substance or credibility of her testimony is only a minor part of the issue. The very fact of a person waiving the marital privilege and testifying against his or her spouse is itself highly damaging whether or not the testimony supports the government's case or particular counts in only a marginal way. Pains should have been taken to enable the jury to evaluate her appearance fairly. The instruction given had the opposite effect and affected all the counts against Long.[8]

### 3. *Electronic Surveillance Tapes*

■ Appellants argue that the district court erroneously admitted tapes of conversations intercepted pursuant to court-or-

---

**8.** In addition, the proof of the Parness extortion by Long was not overwhelming. Parness and an employee of his maintenance company, Douglas Lea, also testified regarding Long's relationship with Parness. Viewing the evidence in the light most favorable to the government, Parness made payments to Long partly out of friendship, partly for help Long provided in running Parness's business, and partly to get and keep a lucrative janitorial contract with UPS for that business. Parness testified that he did not know if Long did anything to ensure that Parness's company would get the UPS contract and that Parness unilaterally increased payments to Long when the UPS business increased.

dered surveillance of Hyman's office. The error claimed is that the tapes lacked the requisite judicial seal and were inadmissible hearsay.

We turn first to the issues raised by the absence of a judicial seal. Pursuant to the procedures mandated in 18 U.S.C. § 2518(8)(a),[9] the recordings had been originally sealed by court order at the expiration of the surveillance orders. The tapes then were unsealed by judicial order for use in the Rotondo trial. An affidavit of FBI Special Agent David Stone indicates that upon completion of that trial, the tapes were resealed by an FBI agent and thereafter maintained "in a sealed and secure condition in a confidential storage area." The tapes were not, however, resealed by judicial order.

Before trial, Long moved to suppress the tape-recorded evidence on the ground that the recordings had not been judicially resealed following the Rotondo trial. Judge Edelstein denied the pretrial motion, finding no statutory requirement of resealing. A month after his ruling, we held in *United States v. Scopo*, 861 F.2d 339, 347 (2d Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989), that there is a resealing requirement. We stated that "once the trial level proceedings to which the unsealing order pertained have concluded, the tapes should be resealed in order to preserve their integrity should their admission be sought in another trial."

Nevertheless, the tapes may be admissible. The purpose of the sealing requirement is to ensure the integrity of evidence obtained by electronic surveillance by providing judicial supervision to prevent alteration. *See United States v. Ojeda Rios*, — U.S. —, 110 S.Ct. 1845, 1849, 109 L.Ed.2d 224 (1990); *Scopo*, 861 F.2d at 347. Even after surveillance tapes have been used in another judicial proceeding, they may not be admitted into evidence without a judicial seal "or a satisfactory explana-

tion for the absence thereof," 18 U.S.C. § 2518(8)(a). *See Scopo*, 861 F.2d at 347. Because it is clear that the tapes here did not have a judicial seal when they were admitted at trial, we must determine whether the government has presented a "satisfactory explanation" for the absence of such a seal.

We believe that the government's failure to obtain a judicial sealing of the tapes is satisfactorily explained by a "good faith, objectively reasonable misunderstanding" of the statutory requirements. *Ojeda Rios* 110 S.Ct. at 1850. *Scopo* had not yet been decided at the conclusion of the Rotondo trial, *see id.*, and the government was understandably not alerted to our interpretation of the statute. Because that interpretation was not obvious on the face of the statute, we are satisfied that judicial seals were absent because of a good faith misunderstanding as to the statutory requirements.

However, the integrity and reliability of the tapes must be assured. Agent Stone's affidavit is extremely cursory, and we believe the matter to be of sufficient importance to require an evidentiary hearing involving live witnesses where appropriate. Accordingly, in the event of a new trial, the district court should hold an evidentiary hearing regarding the chain of custody and integrity of the tapes. If satisfied that they have not been tampered with and are otherwise reliable, the court should admit them into evidence.

■ Appellants also argue that admission of the tape-recorded evidence violated the hearsay rule because the conversations did not constitute statements offered against appellants made "by a coconspirator ... during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Whether a statement was "in furtherance" of a conspiracy is a question of fact to be determined by the court by a

---

9. 18 U.S.C. § 2518(8)(a) provides that "[i]mmediately upon the expiration of the period of the [surveillance] order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." That section further provides:

> The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom....

preponderance of the evidence, *see United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1198 (2d Cir.), *cert. denied sub nom. Lavery v. United States*, —— U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989), and the district court's determination will not be reversed unless clearly erroneous, *see United States v. Salerno*, 868 F.2d 524, 537 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Co-conspirator statements may be found to be in furtherance of the conspiracy within the meaning of Rule 801(d)(2)(E) if they "prompt the listener to respond in a way that facilitates the carrying out of criminal activity," *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir.1987), although the listener need not be a member of the conspiracy, *see Beech–Nut*, 871 F.2d at 1199.

The tapes here involved conversations in Hyman's offices at Resource Capital Corp. In them, Hyman speaks to his secretary, his business partner, various employees, and others. The conversations concern the conduct of the alleged enterprise, such as scheduling meetings with Long and Mahoney, obtaining the loan for Mahoney, discussing means of obtaining cash for payoffs, and reassuring members of the conspiracy. We are satisfied that these conversations facilitated the carrying-out of the conspiracy in question, and the district court's findings were therefore not clearly erroneous.

4. *Expert Testimony on Organized Crime*

■ Appellants argue that the district court abused its discretion by admitting expert testimony regarding organized crime. We agree that the testimony was improperly admitted.

Judge Edelstein ruled that the government's first witness, F.B.I. Special Agent James Kossler, might testify as an expert on organized crime families under Federal Rules of Evidence 702 and 703 [10] and that such testimony was also permissible under Rule 403.[11] Agent Kossler's testimony described the division of La Cosa Nostra into families, some of which operated in New York and New Jersey. He went on to describe the hierarchical structure of such a family, including the respective roles of "the boss," "the underboss," "the consiglieri," "capos" and "soldiers." He defined the difference between "made members" and "associates" and the meaning of "vouching," "sit downs" and "sweetheart contracts." He stated that organized crime families engage in gambling, loansharking, theft, fencing and labor racketeering. Finally, he identified Rotondo as an underboss of the DeCavalcante crime family.

We fail to see how Agent Kossler's testimony assisted the jury either "to understand the evidence or to determine a fact in issue" as required by Rule 702. *See supra* note 10. The claimed nexus between the crimes charged and organized crime families appears to be the fact that Rotondo was a "made member" of the DeCavalcante family and Hyman was an "associate." Rotondo introduced Hyman to Long so they could arrange the various kickback schemes and the two "sweetheart contracts." Long in turn introduced Hyman to Mahoney for the same purpose. In return for Rotondo's introductions, Hyman shared with Rotondo and his superior, Riggi, the ill-gotten gains.

We agree that *the fact* that Rotondo had contacts in organized labor as a result of his position in the DeCavalcante crime family and demanded a fee for his services was relevant background to explain to the jury how and why he was able to facilitate

---

**10.** Fed.R.Evid. 702 provides that an expert witness may testify as to "scientific, technical, or other specialized knowledge" where such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 703 provides:

 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**11.** Fed.R.Evid. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."

Hyman's various schemes by introducing him to Long. Hyman, however, could have testified to that fact, and there was no need to call an expert to explain the hierarchical structure of organized crime families, their jargon, the various unrelated criminal activities in which they engage, and so forth. The sharing of the proceeds from illegal kickback schemes with those who facilitate them is hardly a unique arrangement found only where "made members" introduce "associates" to crooked labor leaders. Indeed, recent highly-publicized scandals in New York City have involved payments to political leaders in exchange for their services as facilitators of corrupt schemes. *See Biaggi*, 909 F.2d at 673, 683 (payments to political officials for "introductions" and for "securing favorable action from other public officials"); *United States v. Friedman*, 854 F.2d 535, 550–51 (2d Cir.1988) (one percent of proceeds of government contract to political leader who served as "peacemaker"), *cert. denied*, — U.S. —, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). We do not believe that a New York jury needs expert testimony to understand that those who facilitate or broker kickback schemes may expect a commission from the proceeds. "Sweetheart contracts" are also not the unique product of organized crime, the term being a general one used to refer to corrupt collective bargaining agreements. *See, e.g. Bauer Welding and Metal Fabricators, Inc. v. NLRB*, 358 F.2d 766, 769 (8th Cir.1966) (sweetheart contracts are "contracts not in the employees' best interest which are sometimes entered into between dishonest union officials and management").

Moreover, Hyman's payments to Rotondo, while necessary to invoke his assistance, were relevant only as background information. Had Rotondo acted as an unpaid broker on Hyman's behalf, none of the charges against Long or Mahoney would have been weakened. In fact, the expert testimony had no probative value with regard to the charges against Mahoney because he had indicated to Hyman an unwillingness to be involved with Rotondo, and Rotondo himself had told Hyman that Mahoney had previously declined to cooperate.

In addition to being only marginally relevant, Agent Kossler's extensive descriptions of organized crime families were substantially prejudicial. Although Rotondo played only an introductory role in facilitating Hyman's relationship with Long, calling Agent Kossler as the first prosecution witness had the effect of implicating Long and Mahoney as part of a much larger criminal organization and associating them with all of the sinister aspects and activities of that criminal organization. It thus operated less to aid the jury than to prejudice it.

The government relies heavily upon *United States v. Daly*, 842 F.2d 1380 (2d Cir.), *cert. denied sub nom. Giardina v. United States*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). In *Daly*, Agent Kossler's testimony also identified organized crime families in the New York area, described their membership rules and conduct, explained some mob jargon, and described their infiltration of labor unions by crime families. *Daly* upheld admission of Agent Kossler's testimony as expert testimony and found no error in the determination that the likely prejudice from such testimony would not outweigh its probative value. *Id.* at 1388–89. In *Daly*, the Gambino crime family was charged as the RICO enterprise, *id.* at 1383, and Kossler's testimony was helpful to the jury's evaluation of the evidence regarding that family. *Id.* at 1388. However, the enterprise alleged in the instant case was not a crime family, and the sharing of proceeds from Hyman's illegal activities with Rotondo was the sole nexus with organized crime. The need for Agent Kossler's explanations was thus quite different.

The fact that the agent did not testify about the particular facts of the instant matter does not reduce the prejudice. This sort of generalized information—by definition not directly related to the case at hand—was quite prejudicial in a case with so thin a nexus to organized crime. For example, because it was generalized, cross-examination could not blunt its prejudicial effect. The evidence thus clearly had an adverse impact "beyond tending to prove

the fact or issue that justified its admission into evidence." *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir.1980).

We appreciate that the district court has considerable discretion in balancing probative value against prejudicial effect and in evaluating the need of the jury for expert testimony, and that criminal conduct may be a proper subject of such testimony. *Daly, supra; United States v. Roldan-Zapata,* 916 F.2d 795 (2d Cir.1990). At the time of Agent Kossler's testimony, however, the court had before it only the indictment and an offer of proof, neither of which demonstrated relevancy. Greater inquiry should have been made as to the degree to which the hierarchy, jargon and general criminal activities of organized crime families would be relevant.

5. *Hypothetical Questioning of Character Witnesses*

■ The district court permitted and itself pursued questions to several defense character witnesses that required the witnesses to assume the guilt of the appellants. In light of our recent decision in *United States v. Oshatz,* 912 F.2d 534 (2d Cir.1990), this questioning was error. We detail the questioning for purposes of determining whether the error was harmless, an issue discussed in the conclusion to this opinion.

The first instance of this form of questioning was during the testimony of government witness Milton Weinstein, an accountant for Local 808. On cross-examination by the defense, Weinstein gave some character testimony favorable to appellant Mahoney. On redirect, the prosecutor asked Weinstein, "If you were to review the evidence in this case ... and you were to learn from that evidence that a corrupt agreement did exist between John Mahoney and Jesse Hyman, would that change your opinion of John Mahoney?" When defense counsel objected, Judge Edelstein stated, "You opened the door.... This is appropriate cross-examination." Weinstein responded that such evidence would change his opinion and that Wein-

stein would have resigned as accountant for the funds had he suspected any such corruption. The prosecutor further asked, "And, would it change your opinion of Mr. Mahoney ... if you were to learn that Mr. Mahoney lied to the FBI and to the grand jury and to others regarding the manner in which he obtained a loan from Sterling National Bank?" to which Weinstein responded, "It certainly would."

A second instance involved hypothetical questions assuming Long's guilt. David Vega, a UPS truck driver and member of Local 804, was called by Long and gave testimony relevant to the Bottom Sportswear allegation of Racketeering Act Six. Vega explained that under their union contract Local 804 members must honor picket lines and that he did not know of any instance in which Long interceded with a Local 804 member or with UPS management on behalf of an employer whose premises were being picketed. On redirect examination, Vega testified that it would have been "out of character" for Long to have encouraged union members to ignore picket lines.

On recross, the government pursued questions regarding whether Vega's opinion of Long's character would change were Vega to learn that Long "had invested the union dues of union members in a particular company in exchange for cash kickbacks" and "had in fact urged UPS supervisors to cross a picket line in order to help out an employer" and had "accepted cash kickbacks in exchange for providing a sweetheart contract" to Emgee Pharmaceuticals. The district court overruled Long's objections and stated that defense counsel had "opened the door" to questions regarding Vega's view of Long's character.

A third instance of questioning with hypotheticals assuming an appellant's guilt involved Brian O'Dwyer, an attorney for Local 808 and administrator of the Local 808 pension fund. O'Dwyer was called by Mahoney and testified on direct examination that Local 804's "good experience" with Penvest had been in his view "an excellent recommendation" of Penvest because Local 804 "had a reputation of being

probably the cleanest, most efficient Teamster local in the United States." O'Dwyer did not mention John Long in that testimony.

On cross-examination by the government, O'Dwyer answered "Yes" to the question,

> You testified on direct examination that that recommendation that John Mahoney told you he had received from John Long meant something to you because Local 804 had a reputation as being among the cleanest and most efficient Teamster locals in the country, do you remember that testimony?

The government then asked if it would change O'Dwyer's opinion of Local 804 to learn that "one of the principal officers of that local, the secretary-treasurer, John Long, accepted bribes and kickbacks in exchange ... for giving sweetheart contracts to employers." When O'Dwyer responded, "No, it wouldn't. I couldn't believe that of John Long," Judge Edelstein overruled Long's objection to the line of questioning and directed the witness, "Assume that is a fact." The government then asked O'Dwyer to assume that the evidence in the criminal case proved that Long had accepted money in exchange for providing sweetheart contracts. O'Dwyer twice again responded that it would not change his opinion. When asked if it would change his opinion "to learn that Mr. Long had accepted bribes and kickbacks in exchange for an agreement to invest his union's fund in Penvest," O'Dwyer responded that he "really can't conceive" of "ever thinking that of John Long." Judge Edelstein then had the following exchange with O'Dwyer:

> THE COURT: You're an attorney, Mr. O'Dwyer?
>
> THE WITNESS: I am, Judge.
>
> THE COURT: You know about hypotheticals don't you. And you know about questions that ask you to assume facts, don't you?
>
> THE WITNESS: I do, your Honor.
>
> THE COURT: You're being asked to assume facts.
>
> THE WITNESS: It's hard for me to assume this fact, your Honor. As a man it's very difficult for me to understand this.
>
> THE COURT: I find it very difficult to understand your answer. Assume these facts and give your answer.
>
> A: Assuming all the facts it would change my opinion.

A witness for Long, John Wallace, experienced similar questioning by the government and the court. Wallace, a UPS porter and Local 804 member, testified that Long was "well known, well respected and well liked" in response to questions from Long's counsel as to whether Long was well known to members of the union and to UPS management. Wallace testified that he did not know of any instance in which Long had interceded with UPS management on behalf of an employer. Wallace also testified that he had known Long for over twenty years but would not lie for Long.

On cross-examination, the government asked Wallace if his opinion of Long would change were he to become "aware that John Long had accepted cash kickbacks in exchange for investing union members' dues in a particular investment company." When the witness repeatedly protested that he "wouldn't believe it," the court ordered him to assume the fact as posed by the government and respond to the question. When Wallace answered that his opinion of Long was so high that even the government's suggested proof would not change his view, the court intervened again, accused Wallace of answering evasively, and expressed disbelief of Wallace's responses. Wallace then finally answered "yes" to a series of questions premised on purported conduct for which Long was on trial.

## CONCLUSION

We reverse as to all counts. For reasons stated *supra*, the RICO and RICO conspiracy counts must be reversed.

With regard to Long's convictions for substantive crimes, they must also be reversed in light of the multiple errors. Although the expert testimony had some probative value in light of his relationship with Rotondo, it was prejudicial in that it invited

the jury to take a somewhat exaggerated view of Long's criminal activities. In addition, the hypothetical questioning of his character witnesses must be viewed in light of *Oshatz* as undermining the presumption of innocence with regard to the non-RICO counts. Finally, as discussed in the body of the opinion, the district court's instruction regarding Mrs. Long's testimony misled the jury by creating the false impression of a witness ready and willing to testify against her spouse. This impression seriously tainted all the counts. Whether any one of these errors would, absent the others, have been harmless is irrelevant in light of the cumulative prejudice caused.

We also reverse Mahoney's convictions for perjury and false statements. Agent Kossler's testimony had no probative value in light of Mahoney's affirmative disassociation from Rotondo. It was, therefore, substantially prejudicial. The hypothetical questioning of character witnesses also was prejudicial and related to Mahoney's entire relationship with Hyman as well as to the obstruction of justice count. Moreover, the evidence was that Long initiated Mahoney's participation in the enterprise, and the indictment named Long as an aider and abetter in two of the three racketeering acts involving Mahoney. If Long were found guilty, Mahoney's conviction would probably follow. We believe, therefore, that the tainting of the jury's consideration of the evidence against Long likely affected its consideration of the evidence against Mahoney. Again, we believe the cumulative prejudice calls for reversal on all counts.

The effect of the *Biaggi* decision on the various counts against each defendant, *see* note 7 *supra*, must be determined in the first instance by the district court, should the government elect to retry the defendants.