26 F.3d 133
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
John DIFRONZO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald J. ANGELINI, Defendant-Appellant.
 Nos. 93-50417, 93-50444.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 5, 1994.
Decided May 24, 1994.
 
 Appeal from the United States District Court for the Southern District of California; Nos. CR-92-00026-02-E, CR-92-26-03-WBE, William B. Enright, District Judge, Presiding.
 S.D.Cal.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before: HALL, LEAVY and FERNANDEZ, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 In these consolidated appeals, Donald John Angelini and John DiFronzo appeal their convictions for conspiracy, in violation of 18 U.S.C. Sec. 371, and mail and wire fraud, in violation of 18 U.S.C. Secs. 1341 & 1343, as well as the sentence each received for these convictions.
 
 
 3
 * Appellants claim that the subject of the alleged fraud was a bingo license which is neither money nor property.[1] The government argues that appellants intended to defraud the Rincon Band of its property interests in (1) the use of its facilities and grounds, (2) the monetary profits generated by the gambling activities, and (3) the future viability of an operation that it believed met BIA standards.
 
 
 4
 In this case, appellants intended to obtain a lease, not a license as defendants choose to characterize the facts, by false representations that Sam Kaplan was the "sole principal investor." The evidence unequivocally established that if the Band had known that members of organized crime would be investors, the Band would not have even considered the Kaplan proposal. "The strictures an owner puts on his willingness to sell an item are not mere ephemera. When a prospective buyer lies in order to evade those strictures, a fraud has been committed upon the owner of the item just as surely as if the buyer had issued a rubber check." United States v. Bruchhausen, 977 F.2d 464, 469 (9th Cir.1992) (Fernandez, J., concurring). Thus, even though defendants may have been willing to pay fair market value and even if they had intended to manage the operation fairly, their actions violate the mail and wire fraud statutes because they intended to obtain the Band's property by misrepresenting the identity of the investors. This scheme violates the mail and wire fraud statutes. Accordingly, we need not consider the government's other proffered grounds for affirmance.
 
 II
 
 5
 Appellants argue that the figure of $500,000 used by the district court to increase their base offense level is sheer speculation. Section 2F1.1 of the Sentencing Guidelines instructs the sentencing court to increase "the base offense level ... depending on the money lost because of fraud, and instructs the court to use the highest of the 'actual' or 'probable or intended' loss." United States v. Shaw, 3 F.3d 311, 312 (9th Cir.1993). The district court must explain why the figure of $500,000 represents either the "actual" or "probable or intended" loss. On the current record, we are not persuaded that the amount defendants' organization would have invested in the business may serve as a substitute for loss in this instance. We reverse appellants' sentences and remand for resentencing.
 
 III
 
 6
 Appellants describe their alleged illegal conduct as omitting from the Kaplan proposal the names of other investors so as to conceal the involvement of organized crime. They make this claim because a non-disclosure (as compared to an affirmative misrepresentation) may serve as a basis for a fraudulent scheme only when the non-disclosure breaches an independent duty. See United States v. Dowling, 739 F.2d 1445, 1449 (9th Cir.1984), rev'd on other grounds, 473 U.S. 207 (1985).
 
 
 7
 DePento described Kaplan as the "sole principal investor." Whether we interpret this statement as representing that Kaplan was the sole investor or the only main investor, implying the involvement of other minor investors, the statement is a misrepresentation. Kaplan was only a front-man and a minor investor at most. Appellants were not entitled to their requested instruction.
 
 IV
 
 8
 Appellants maintain that the district court erred in allowing admission of evidence that Angelini had an undisclosed ownership interest in a bingo operation in Maryland called Bingoworld. Evidence of other acts is properly admitted when offered as " 'direct evidence,' used to flesh out the circumstances surrounding the crime with which the defendant [was] charged, thereby allowing the jury to make sense of the testimony in its proper context." United States v. Ramirez-Jiminez, 967 F.2d 1321, 1327 (9th Cir.1992).
 
 
 9
 Certain taped conversations referred to an unidentified individual. The government explained these references by introducing evidence that Angelini was involved in another bingo operation and that the unidentified individual mentioned in the taped conversations was the named owner of Bingoworld. The testimony also explained that Angelini's losses from his involvement with Bingoworld prompted him to walk away from the Rincon deal. The Bingoworld evidence assisted the jury in making sense of the evidence.
 
 
 10
 Although "[i]t is always possible that the similarity between the prior acts and the current offense would improperly affect the jury's deliberations, ... the district court carefully instructed the jury on the limited purposes for which the evidence was admitted." United States v. Houser, 929 F.2d 1369, 1373 (9th Cir.1990); see also United States v. Nadler, 698 F.2d 995, 1000 (9th Cir.1983) (district court minimized prejudice by giving cautionary instruction). Accordingly, we affirm the district court's admission of this evidence.
 
 V
 
 11
 Appellants challenge the admission of organized crime evidence as well as the description of organized crime contained in the indictment. The government theorized that appellants intentionally concealed their identity because they are members of organized crime. Certain codefendants expressed this very concern during conversations recorded by the government. Thus, it was necessary for the jury to understand the nature of organized crime so as to appreciate the necessity for concealing its involvement. The structure of Chicago organized crime was also necessary to show the relationship between the defendants.
 
 
 12
 The Second Circuit's decision in United States v. Long, 917 F.2d 691 (2d Cir.1990), is factually distinguishable. In that case, "[t]he claimed nexus between the crimes charged and organized crime families appear[ed] to be the fact that [one member of the enterprise] was a 'made member' of the DeCavalcante family and [another] was an 'associate.' ... [T]he fact that [the one] had contacts in organized labor as a result of his position in the DeCavalcante crime family and demanded a fee for his services was relevant background to explain to the jury how and why he was able to facilitate [the other's] various schemes." Long, 917 F.2d at 701-02. The court concluded that any additional evidence regarding organized crime, however, was error.
 
 
 13
 Although Long was a "case with so thin a nexus to organized crime," id. at 702, appellants' involvement in organized crime is the very impetus for hiding their identity. The district court instructed the jury that the appellants "are not on trial for allegations that they are members of or associated with organized crime." Given the significance of the evidence and the court's limiting instruction, we cannot conclude that the district court abused its discretion.
 
 VI
 
 14
 Appellants seek a new trial on the grounds that (1) the government knowingly used perjured testimony given by Leonard Patrick to obtain a conviction and (2) that the government "vouched" for Patrick's credibility. Appellants rely upon a case from the Second Circuit to support their argument that Patrick's perjury warrants reversal. That case, however, is factually distinguishable. The perjury occurred by "a key government witness" during direct examination. United States v. Wallach, 935 F.2d 445, 449, 455 (2d Cir.1991). The government represented that the witness "had undergone a radical moral transformation," and this fact was the subject of the witness's perjured testimony. Id. at 458.
 
 
 15
 In contrast, Patrick was not a "key witness" and the subject of his perjury, disclaiming responsibility for six murders on the grounds that he committed them in self-defense, was peripheral to the issues in appellants' trial and not relevant to the government's use of Patrick's testimony. The government did not elicit the false testimony. Rather, Patrick lied during cross-examination. Moreover, defense counsel used transcripts from another proceeding to impeach Patrick on this issue. The trial court commented that even the jury was laughing or smiling during Patrick's testimony. Defense counsel went through each and every one of the six murders and in response to each one Patrick claimed the victim pulled or was about to pull a pistol, causing Patrick or his cohort to shoot the victim in self-defense. Defense counsel did not cross-examine Patrick on any of his testimony regarding defendants. Moreover, Patrick's testimony did not tie appellants to the Rincon fraud. There exists no reasonable likelihood that the false testimony could have affected the judgment of the jury.
 
 
 16
 To support their allegation of vouching, appellants point to the following statement made by the government during closing arguments: "They call [Patrick] a liar ...; but Ladies and Gentlemen, what kind of liar tells you about murders that were unsolved until he told you about it and exposed himself to criminal prosecution for it?" Appellants did not object.
 
 
 17
 This statement did not place the prestige of the government behind Patrick. See United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.1993). It is an "inference from evidence in the record," although an arguably weak inference given defense counsel's efforts at impeaching Patrick, and hence, is not vouching. Id. at 1279. Even if the statement constitutes vouching, it is not of the form or importance to the case overall to warrant a new trial. See id. at 1278 (outlining factors to consider including, form of vouching, inferences of extra-record knowledge, degree of personal opinion asserted, timing of vouching, extent to which witness's credibility attacked, etc.). The district court did not commit plain error. See id. at 1276 (where no objection made at trial, vouching by prosecution results in reversal only if there is plain error).
 
 VII
 
 18
 Appellants also claim that the charges against them were improperly joined and even if properly joined, that they were nonetheless entitled to severance. Prior to trial the indictment contained a RICO count that tied the two schemes together by alleging that each scheme was an act of racketeering through which certain defendants conducted the affairs of the Chicago organized crime family. Although neither DiFronzo nor Angelini were named in the RICO count, they were named in the counts charging the offenses committed by the predicate acts of racketeering. The RICO count justified joinder.
 
 
 19
 Appellants contend that their joinder nonetheless fails because the only defendant named in the RICO count who went to trial with them pleaded guilty after opening statements. This change in circumstances, however, will not retroactively render improper the otherwise proper joinder of these appellants. See Schaffer v. United States, 362 U.S. 511, 514-16 (1960) (question is not whether joinder is proper but rather question of severance under Rule 14 where joinder initially proper but conspiracy claim is dismissed before submission of case to jury); United States v. Catabran, 836 F.2d 453, 460 (9th Cir.1988) (dismissal of conspiracy charge that supports joinder does not require reversal absent manifest prejudice). Moreover, joinder under Rule 8(b) is subject to harmless error review. United States v. Lane, 474 U.S. 438, 446 (1986); United States v. Martin, 567 F.2d 849, 854 (9th Cir.1977). The extortion evidence was brief, consuming only one and one-half days, and the court instructed the jury that the evidence should be considered only in relation to certain charges. The error, if any, was harmless.
 
 
 20
 Appellants also claim that they were entitled to severance. The fact that more evidence was introduced against one codefendant than another is insufficient to show that joinder was improper. United States v. Taren-Palma, 997 F.2d 525, 533 (9th Cir.1993), cert. denied, No. 93-7585, 1994 WL 31878 (May 2, 1994). " '[W]here as here, the district court uses great diligence in instructing the jury to separate the evidence, severance is unnecessary because the prejudicial effects of the evidence of codefendants are "neutralized".' " United States v. Freeman, 6 F.3d 586, 599 (9th Cir.1993), cert. denied, No. 93-8558, 1994 WL 122936 (May 2, 1994). "The jury's selective verdicts also support the district court's decision" to deny the Rule 14 motion. United States v. Baker, 10 F.3d 1374, 1388 (9th Cir.1993). The district court did not abuse its discretion in denying the Rule 14 motion for severance.
 
 VIII
 
 21
 DiFronzo claims that the evidence was insufficient to establish his knowing joinder of the conspiracy. Once a conspiracy is established, substantial evidence of only a slight connection to it is necessary to convict. United States v. Pinkney, 15 F.3d 825, 826 (9th Cir.1994). Patton testified that on July 2 or 3, 1985, DiFronzo nodded in the affirmative when asked whether he wanted to invest in a bingo hall on an unidentified Indian reservation located in San Diego. On December 17, 1987, Caracci told Petti that there would be a meeting the following Sunday to get the "final say" on the Rincon project. A meeting occurred the following Sunday between Caracci, Angelini, Carlisi and DiFronzo. After that meeting, Caracci told Petti that "they want go with that thing," and that $500,000 would be appropriated for the Rincon project. Also, the government presented many taped conversations implicating Caracci in the Rincon fraud. Caracci answered to DiFronzo. Money made by Caracci would be sent up the line to DiFronzo, even if DiFronzo did not invest personally. The totality of evidence, taken in the light most favorable to the government, supports DiFronzo's conviction.
 
 IX
 
 22
 DiFronzo contends that the district court erred when it redacted Count 1. In United States v. Hutchison, Nos. 91-10225, 91-10598 (9th Cir. May 4, 1993), we rejected the argument that a redacted indictment is an impermissible amendment.
 
 
 23
 Appellants' convictions are AFFIRMED. We REVERSE appellants' sentences and REMAND for resentencing.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Defendants' activities occurred before Congress modified the mail and wire fraud statutes in response to the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987). Therefore, McNally "continues to provide the rule of decision for [this] conduct that occurred prior to the statute's enactment." Lancaster Community Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 n. 15 (9th Cir.1991), cert. denied, 112 S.Ct. 1168 (1992)